Filed 2/25/15  P. v. Palacio CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064643 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD231290) |
| LAWRENCE PALACIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Lawrence Palacio appeals a judgment following a jury verdict finding him guilty of one count of felony child abuse (Pen. Code, § 273a, subd. (a)).[1]  On appeal, he

---

1    All statutory references are to the Penal Code unless otherwise specified.

contends: (1) the evidence is insufficient to support his conviction; (2) the trial court erred by denying his request for an Evidence Code section 402 hearing on the foundation for the opinions of the prosecution's expert witnesses and/or by not requiring the prosecution to comply with its section 1054.1 discovery obligations regarding its witnesses; (3) the trial court erred by denying his Evidence Code section 352 motion to exclude evidence regarding a Navy form he signed that changed his former wife's address and allowing the prosecutor to question him and argue to the jury based on that form; (4) the prosecutor committed prejudicial error in questioning certain witnesses; and (5) the trial court erred by denying his Evidence Code section 352 motion and admitting into evidence a photograph showing his son's cranial bolt while hospitalized.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Palacio and his girlfriend, then known as Miriam P. (Miriam), lived together in a two-bedroom apartment in La Jolla.[2] Miriam was pregnant with their baby and intended to have a natural, vaginal birth. On April 26, 2010, she went into labor and was admitted to Scripps La Jolla Hospital (Scripps). Miriam's blood pressure spiked and her baby began to show intermittent fetal distress by his heart rate slowing. Because a vaginal birth had been unsuccessful, Dr. Gary Vandenberg, her obstetrician, delivered her baby by an emergency C-section. The baby, named G., weighed five pounds, one ounce,

---

[2] Palacio and Miriam married on April 13, 2012. To avoid confusion, we refer to Miriam by her first name and, in so doing, intend no disrespect.

2

and had Apgar scores of 8 and 9 out of 10, meaning he was a normal baby with a good heart rate, respiration, color, and glucose.

After G.'s birth, Dr. Robert Warner became his pediatrician. G. was discharged from the hospital without any complications three days after his birth. At G.'s routine office visits, Warner examined him and found his weight, growth, oxygen level, and head circumference were normal. Warner believed G.'s brain development was normal.

Miriam believed G. was healthy, albeit colicky. When he became fussy at night, she rocked him, danced with him, sang to him, and put him in a swing. Sometimes Palacio would also care for G. and would become frustrated by his crying. Miriam would then take over caring for G. She never saw Palacio lose his temper and be rough or harm G. in any way. Prior to July 13, 2010, G. had not suffered any trauma.

After Miriam returned to work, E. P., her mother, cared for G. while she was at work. P., a former midwife, believed G. was one of the fussiest babies she had cared for, crying whenever he was not held. She said G. would stare and not make eye contact with her.

On the morning of July 13, G. woke up, smiled, and looked his mother in the eye. Her interactions with him were normal. Miriam and Palacio took G. to P.'s house and went to a gynecological appointment for Miriam. They picked G. up at about 2:30 p.m. G. had his normal temperament and had no accidents while at P.'s house.

At about 10:30 p.m. that night, G. woke up and began his normal crying. Palacio offered to take care of G. and gave him a bottle. Miriam fell asleep, but was later awakened by Palacio, who had a look of terror, or fear and worry, on his face. She got up

3

and found G., who was then breathing, on the couch. When she tried to pick him up, Palacio stopped her. A minute later, she picked up G. and asked Palacio what had happened. He replied that he was rocking G. to sleep, G. stopped crying, and then he stopped breathing. Palacio said he performed CPR on G. They took G. to Scripps, the closest hospital.

Dr. Ian Reilly, an emergency room physician at Scripps, treated G. Palacio and Miriam told him G. was crying, suddenly became lifeless, and stopped breathing for two minutes. Palacio gave G. two rescue breaths and G. began breathing again. They did not report any trauma to G. Lab tests showed G.'s white blood cell count was elevated and he was not getting enough oxygen. Reilly concluded G. had suffered metabolic acidosis, indicating he had a hypoxic event, or a lack of oxygen, to his entire body. A lumbar puncture showed his spinal fluid contained blood, indicating bleeding on G.'s brain. A CT scan of G.'s brain showed he had an acute on chronic subdural hematoma on the left side of his brain. The blood in his brain appeared to be of different ages. After finding G. did not have an infection and forming the belief he had suffered trauma, Reilly had G. transferred to Rady Children's Hospital (Rady) at about 5:30 to 6:00 a.m. on July 14.

At Rady, tests showed G.'s white blood cell count had returned to normal, indicating he did not have an infection, a metabolic disorder, or a bleeding disorder. G. did not have any skeletal fractures and his frenulum was not torn, thereby not showing any sign of smothering. A CT scan of G.'s brain showed subdural bleeding of different ages (i.e., densities).

4

The following day, July 15, G. began having "absent stare seizures" that appeared on an EEG of his brain, but did not result in any physical manifestations. On July 16, an MRI showed his brain was beginning to swell (i.e., cerebral edema). A neurosurgeon inserted a bolt through G.'s skull to monitor the pressure in his brain and a shunt was placed to drain extra cerebrospinal fluid. In July and August, CT scans and MRIs showed he had dead tissue in the posterior of his brain that was caused by a hypoxic ischemic injury (i.e., deprivation of oxygen or blood to the brain). The subdural and hypoxic ischemic events both caused death of brain tissue and were two different injuries. An October 18, 2010, MRI showed a new subdural hematoma.

On August 4, G. was released from the hospital. Warner, his pediatrician, found G. was different because he did not follow him with his eyes as he had before. Warner believed G.'s developmental delays were consistent with the brain injury he suffered on July 13.

An information was filed charging Palacio with one count of felony child abuse (§ 273a, subd. (a)). It further alleged that in committing that offense he personally inflicted great bodily injury on a child under the age of five years (§ 12022.7, subd. (d)), and personally inflicted great bodily injury within the meaning of section 1192.7, subdivision (c)(8).

*Prosecution's case.* At trial, the prosecution presented evidence substantially as described above, as well as the testimony of various percipient and expert witnesses regarding G.'s injuries and statements made by Palacio and Miriam. Dr. Preeti Bansal, a Rady pediatric opthalmologist, testified that on July 14, 2010, she examined G. and found

5

he had extensive retinal hemorrhaging in all three layers of the retinas in both eyes. Bansal testified that very few events could cause that type of injury, stating the "number one" cause is "nonaccidental trauma from a shaking-type injury, where there is acceleration and deceleration of the eye . . . ."

Dr. Jerry Dwek, a Rady pediatric radiologist, reviewed the CT scan performed on G.'s brain at Scripps on July 14 and testified it showed a left subdural hematoma with an area of bleeding and an area of old bleeding. He also testified the new bleed occurred between a couple of hours and a couple of days before the scan. Although the other area of old bleeding could not be dated, he stated it could not have occurred during birth because such hemorrhages resolve or are absorbed by four weeks of age. Dwek stated significant trauma is the primary cause of blood in the subdural space. One cause of that trauma is shaking a baby because veins in the brain are ruptured. He testified that "[b]lood equals trauma." He testified that either a subdural hemorrhage or the loss of oxygen to the brain could cause a seizure.

Dr. Cynthia Kuelbs, a pediatrician and medical director of the Chadwick Center for Children and Families at Rady, examined G. at Rady and reviewed all of his hospital records, pediatric records, radiology and neurology reports, birth records, and opthalmology records. Kuelbs testified the type of retinal hemorrhages G. had result only from very significant trauma. That type of retinal hemorrhage would not be caused by infection and any retinal hemorrhages from birth would have disappeared by two months of age. She testified that shaking can cause a subdural hematoma. Furthermore, the hypoxic injury G. suffered could have been caused by suffocation, by apnea and not

6

breathing for a while, or by another brain insult that led to swelling and poor blood flow to that area of the brain. Her study on hypoxia, published in 2008, showed none of the 150 children in the study who had gone without oxygen had suffered any bleeding in neuroimaging studies. Kuelbs did not believe the lack of oxygen alone would cause a subdural bleed. Furthermore, children who die from positional asphyxia generally do not show any visible or physical signs of asphyxia.

According to Kuelbs, G. had hypoxic ischemic injuries. Both hypoxic injuries and trauma can cause seizures. Kuelbs stated there was no evidence G.'s seizures were caused by anything other than his July 13 brain injury. There was no evidence G. suffered any seizures in the years after his brain injury cleared. The brain injury that caused G.'s subdural hematoma could also have caused the increase in his intracranial pressure. Crying and rescue breaths could not have caused an increase in his intracranial pressure.

Kuelbs testified G. suffered trauma that caused his retinal hemorrhages and brain injury (i.e., subdural hematoma) and led to his seizures. His trauma was consistent with "some type of fast acceleration/fast deceleration," most commonly a shaking injury, but could also have been caused by someone throwing him onto a soft surface. Regarding G.'s hypoxic injury, she stated it was difficult to determine whether it was caused by the brain trauma and resulting seizures or by a separate event such as suffocation. Nevertheless, G.'s hypoxic injury was consistent with him being pressed into Palacio's chest until he stopped breathing. G.'s injuries were consistent with having occurred shortly before his admission into the hospital, but not back to the time of his birth

7

because he had several months of care after his birth by a good pediatrician and had been doing very well.

Jill Farabelli, a social worker who worked at Rady, testified that she met Palacio and Miriam during the morning of July 14, 2010. Palacio told Farabelli what happened before G. stopped breathing. He stated that he put G. in a swing and G. stopped breathing. He stated G. had not been in an accident, experienced trauma, or had a recent illness. Neither Palacio nor Miriam mentioned a shaking or smothering of G.

Mya Bryson, a child protective services supervisor, testified that on July 14, 2010, she was called to Rady regarding a suspected child abuse case. On her arrival, Farabelli briefed her, and Bryson then interviewed Palacio in G.'s room. Palacio stated the baby had been planned and G. had not experienced any health problems. Palacio did not mention any staring spells. Palacio had just returned from a short Navy deployment on July 9. G. seemed to have a pickier demeanor on his return. He said G. was a fussy child, spoiled, and colicky. Late on July 13, Palacio took care of G., who was crying in a more high-pitched sound than normal, "almost like he was in pain." G. head-butted him in the chin. While Palacio was holding him, G. went limp and stopped breathing. Palacio did not mention pressing G.'s face into his chest or otherwise muffling or smothering his cries. Palacio denied shaking G. He admitted he sometimes got frustrated with G., especially when he cried.

Dr. Sarah Villarroel, a Navy general pediatrician and child abuse pediatrician, testified she was consulted regarding G.'s case on July 14, 2010. During Bryson's interview of Palacio, Villarroel entered the room and both she and Bryson questioned him

8

while Farabelli was also present. Palacio did not mention that G. had any staring spells or head-butting incidents. Starting about 10:30 p.m. on July 13, Palacio began holding and walking around with G., but could not console him. He placed G. in a swing, but that also did not calm him down. While Palacio was later carrying him, G. stopped breathing. Palacio did not mention he pressed G.'s face into his chest or shook him. Palacio stated he gave G. two rescue breaths without any chest compressions. Villarroel and Bryson also interviewed Miriam, who did not mention any history of accident, trauma, or seizures.

At about 5:00 to 6:00 a.m. on July 14, 2010, San Diego Police Detective Brooke Lawson, who was assigned to the police department's child abuse unit, went to Rady in response to a call. Farabelli had previously briefed Lawson on the telephone regarding G.'s situation and the statements made by Palacio and Miriam. Lawson first interviewed Miriam, who described the events leading up to G.'s hospital visit. She did not tell Lawson that G. would stare off into the distance.

In a recorded two-hour interview, Lawson and another detective questioned Palacio. Palacio stated he had recently returned from a 10-day Navy deployment. Miriam's pregnancy with G. was "not exactly planned." G. had been healthy before the July 13 event. Palacio did not mention any staring spells. He denied that G. had suffered any accidents. He stated G. was fussy and occasionally head-butted him. Palacio told Lawson that he cared for G. that night by holding him, rocking him, singing to him, placing him in a swing, placing him facing away from him and then toward him, and placing him on his lap and rubbing his back. While Palacio was holding G., he gave out

9

a "cry from hell," went limp in his arms, and stopped breathing. Palacio stated he gave G. two rescue breaths and revived him. Palacio repeatedly denied he shook G. During the 45-minute period during which he tried to console G., he (Palacio) became angry and frustrated by G.'s crying and his (Palacio's) body began shaking while holding G. Stating it was a "lose-lose" situation, Palacio started to cry and admitted he held G. tightly against his chest twice, trying to stop or muffle his crying, but making sure his nostrils were visible. He stated that G. also head-butted him. Palacio denied throwing G. onto the couch. Using a doll, Palacio demonstrated for Lawson how he cared for G. that night.[3] In one segment (Exh. 19), Palacio showed how he held G. tightly to his chest to muffle his crying. In another segment (Exh. 20), Palacio showed how he held G.'s head in his right hand and swung his body right and left while jiggling G.'s head up and down, which he referred to as the shaking motion. Palacio stated that after the second time he pressed G.'s face into his chest, G. stopped breathing. Palacio admitted he was "really frustrated" with G.'s crying. He stated his "whole upper body was shaking" while he held G. Lawson spoke with Miriam again on July 24 and, for the first time, she mentioned G. had done "some staring in the past."

Kelly Monge, a child protective services supervisor, spoke with Miriam, her mother and two of her sisters on July 29, 2010. Miriam and one sister stated they believed G. had staring spells before he was hospitalized. On November 18, Monge spoke with Palacio about what happened on July 13. He told her he was aware of his

---

3 Palacio's demonstration was videotaped and later played for the jury.

behaviors (i.e., what he did) that night and believed his son's condition was due to those behaviors. He told Monge he was going to try to learn a way to deal with his frustrations.

*Defense case*. Cathy P.-Sugatan, Miriam's oldest sister, testified in Palacio's defense that when G. was four to six weeks old, on four or five occasions she saw his eyes turn away from her for five to 10 seconds. G. would stare at nothing and his eyes were not focused. She told Miriam about G.'s staring. However, on cross-examination, she admitted she had not told Lawson there was anything wrong with G.'s eyes. She first mentioned it to Monge on July 29, 2010. Christine Mathews, Miriam's other sister, testified she never saw G. stare off into the distance. G. was very irritable and inconsolable.

Palacio testified in his own defense. He stated he was 34 years old and unemployed. He and Miriam were not married in 2010. Miriam's pregnancy was "sort of planned," but they "weren't exactly ready to have a baby." He was separated from his first wife and planning to divorce when G. was born. He stated he told Warner, G.'s pediatrician, about G.'s staring spells. At about 10:00 p.m. on July 13, 2010, Miriam fed G. and then Palacio told her he would take care of him. He changed G.'s diaper and swaddled him in a blanket. He went to the living room with G. and held him while walking back and forth, but G. continued to cry. As Palacio was moving G. to his left shoulder to pat him on the back, G. jerked his head back and head butted him in the chin. G. was sweating and trying to kick out of the swaddle. Palacio took off the swaddle, sat on the couch, and placed G.'s stomach on his thigh and rubbed his back to relieve gas. G. began crying hysterically and continued sweating. After additional efforts to relieve G.'s

11

gas were unsuccessful, Palacio cradled G. in his forearm and rocked him back and forth. When G. continued to cry hysterically, Palacio moved him in a figure-eight motion to imitate the swing motion. G. cried louder than he had ever before, as if he was in pain. Palacio was getting a little frustrated and held G. tighter to him. G. then began to jerk around harder, rigidly straightened out his arms and legs, let out a loud cry, and then stopped crying. Palacio then realized G. was not breathing. He did not believe he had done anything to cause G. to stop breathing. Although he was frustrated with G., he was not angry and denied hurting G. Using his CPR training, Palacio gave G. two rescue breaths, sat him up, and patted him on the back. During the following five minutes, G.'s breathing returned to normal. Palacio then woke Miriam up and told her G. had stopped breathing. They then took G. to the hospital. During his interview with Lawson, he used the word "shaking" as meaning the rocking and figure-eight motion he used while holding G. securely. He denied shaking G. On cross-examination, Palacio denied he pressed G. into his chest.

Dr. Michael Weinraub, a pediatrician, testified as a defense expert. He reviewed G.'s birth records, pediatric records, hospital records from Scripps and Rady, Villarroel's report, Lawson's reports, and Palacio's video recordings. G. did not have a normal birth without complications. Miriam had preeclampsia and G.'s heart rate changed, which led to a C-section birth. In a study published in 2008, four of 22 infants born by C-section showed subdural hematomas and 32 of 101 infants born by vaginal deliveries had subdural hematomas. He believes it is possible for bleeding from a birth injury to continue weeks later. A condition called benign extra cerebral collection involves too

12

much fluid on the brain and can be caused during birth. That excessive fluid can stretch the bridging veins from the dura and make it bleed more easily. Although infection does not directly cause subdural hematoma, it can cause a different kind of fluid on the brain that can stretch the bridging veins and cause bleeding.

Weinraub testified that G.'s fetal distress was caused by compression of his head in the birth canal. His variably decelerating heart rate was caused by some kind of brain trauma (e.g., squeezing of the head or hypoxia). Molding of a baby's head so it can fit through the birth canal can cause bleeding on the brain. The length of time G. spent in the birth canal increased his chances of suffering a subdural hematoma during birth. Weinraub disagreed that the existence of subdural hematoma blood necessarily meant a child suffered trauma. Subdural hematomas can be caused by genetics, metabolism, cancer, sickle cell, osteogenesis, coagulation disorders, ruptured aneurysm, and hemophilia.

Weinraub also was concerned about the rapid increase in G.'s head circumference after birth (i.e., from the 10th percentile at birth to the 80th percentile on July 14). He believed that significant increase warranted testing (e.g., CT scan or MRI) to determine if there were problems (e.g., extra fluid on the brain or subdural hematoma). In his opinion, given G.'s history prior to July 14, he was not a "normal" baby.

Weinraub further stated G.'s medical status on July 14, 2010, was not solely consistent with trauma, but could also have been the result of other nontrauma events (e.g., apparent life-threatening event, infection, or thrombosis). Also, rescue breaths could increase intracranial pressure, which could cause retinal hemorrhages and bleeding

13

on the brain. G.'s increased white blood cell count was more likely due to infection than head trauma or stress. His low platelet count meant he had a higher propensity to bleed and was a greater sign of infection. His metabolic test showed metabolic acidosis, which is consistent with infection and could cause his cellular systems to malfunction. He did not have respiratory acidosis, a sign of smothering.

Weinraub testified the chronic or acute subdural hematoma shown on the Scripps CT scan could have been caused by something other than nonaccidental trauma. G.'s abnormal eye movements could be a sign of seizures. G.'s EEG on July 15, 2010, showed four or five nonclinical seizures (i.e., electrical activity in brain without any body shaking), which Weinraub believed were consistent with G.'s staring spells.

Weinraub stated retinal hemorrhages can be caused by accidental or nonaccidental head trauma, ruptured aneurysm, infection, and increased intracranial pressure. He stated G.'s retinal hemorrhages were caused by the significant increase in his intracranial pressure, along with cofactors of infection and low platelet count. Severe crying can cause increased intracranial pressure. Also, G.'s numerous blood draws and spinal taps could have enhanced his retinal hemorrhages. He stated retinal hemorrhages cannot be dated.

Weinraub testified G.'s October 18, 2010, MRI showed a significant acute rebleed. However, there was no investigation of any cause other than his prior condition. Weinraub stated, to a reasonable degree of medical certainty, G. had birth trauma that resulted in a chronic subdural hematoma, which could bleed with little or no trauma. G. bumped his head on Palacio's chin and cried worse because the bump triggered a bleed or

14

thrombosis, as well as a seizure or shift in his brain that caused him to stop breathing. G.'s October 18 MRI confirmed his opinion.

On cross-examination, Weinraub conceded the subdural hematomas in the 2008 study he cited resolved within three months and most resolved within one month. He also conceded there were studies concluding that increased cranial pressure does not cause retinal hemorrhages. He conceded shaking can cause retinal hemorrhages.

Dr. Patrick Barnes, a pediatric radiologist and pediatric neuroradiologist at the Stanford University Medical Center, reviewed the MRIs and CT scans performed on G. He also reviewed G.'s other medical records, Weinraub's report, and Dwek's PowerPoint presentation. Barnes testified G.'s July 14, 2010, CT scan showed an acute hemorrhage, his July 19 CT scan showed no recurring hemorrhage, but showed swelling of the brain, and brain swelling was most likely related to the seizures G. suffered. G.'s July 14 MRI showed there was no brain injury due to the lack of oxygen or blood flow or any brain injury characteristic with smothering. G.'s October 18 MRI showed a new, large hemorrhage. Imaging cannot distinguish between accidental and nonaccidental trauma.

*Prosecution's rebuttal.* In rebuttal, the prosecution played the audio recording of Palacio's July 14, 2010, interview by Lawson (Exh. 63). During the interview, Palacio stated that while he was holding G. really tight, "my whole upper body was shaking." G. then stopped crying and Palacio put him down and noticed he had stopped breathing.

*Jury's verdict and sentencing.* The jury found Palacio guilty of felony child abuse (§ 273a, subd. (a)) and found true both allegations. The trial court imposed, but suspended execution of, an eight-year sentence, and granted Palacio five years of formal

15

probation on the condition he serve 365 days in county jail.  Palacio timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence to Support Palacio's Conviction*

Palacio contends the evidence is insufficient to support his conviction of felony child abuse.

A

When a defendant challenges his or her conviction for insufficient evidence on appeal, we apply the substantial evidence standard of review.  "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]  The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261, italics added in *Cuevas*.)  We "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  Furthermore, "[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported

16

by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid*.) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

B

Section 273a, subdivision (a), defines the offense of felony child abuse, stating:

> "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, . . . shall be punished by imprisonment . . . ."

The willful causation of unjustifiable pain or mental suffering requires only a general, and not a specific, criminal intent. (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445.) Section 273a does not require the child actually sustain great bodily injury. (*People v. Clark* (2011) 201 Cal.App.4th 235, 245.) Under section 273a's requirement of "circumstances or conditions likely to produce great bodily harm or death," the term "likely" means a substantial danger, or a serious and well-founded risk, of great bodily harm or death. (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204.)

The trial court in this case instructed the jury with CALCRIM No. 821 on the elements of felony child abuse. The prosecutor argued in closing that Palacio inflicted unjustifiable physical pain or mental suffering on G. by shaking him, which led to the subdural hematoma and retinal hemorrhages, and by smothering him, which stopped his breathing and led to his hypoxic ischemic brain injury. Palacio's defense counsel argued there was no evidence Palacio smothered G. and no evidence proving beyond a

17

reasonable doubt that he caused G.'s subdural hematoma and retinal hemorrhages by shaking him.

C

Based on our review of the whole record, we conclude there is substantial evidence to support the jury's finding that Palacio committed the offense of felony child abuse (§ 273a, subd. (a)). Warner testified G.'s well-baby examinations were normal and neither parent expressed any concerns about him. On July 13, 2010, Palacio had recently returned from a short Navy deployment, was working long hours, and was stressed. After G. stopped breathing, he was taken first to Scripps and then to Rady. His CT scans and MRIs showed he had subdural bleeding on the left side of his brain, with one part new (i.e., within hours to days old) and the other part older. Dwek testified significant trauma is the primary cause of subdural bleeding, and that trauma could be caused by shaking a baby. Kuelbs testified G.'s trauma was from fast acceleration and deceleration, most likely from shaking. Bansal testified G.'s severe retinal hemorrhaging was most consistent with shaking or a very serious car accident. Kuelbs testified G.'s retinal hemorrhages resulted only from very significant trauma, and any retinal hemorrhages from birth would have been gone by two months of age. Tests ruled out infection or other possible causes of G.'s subdural bleeding and retinal hemorrhages. Dwek testified any subdural hemorrhages from G.'s birth would have been absorbed by four weeks of age. Kuelbs testified there was no evidence showing a lack of oxygen alone can cause a subdural bleed. Kuelbs testified brain trauma can cause seizures and there was no evidence of any cause of G.'s seizures other than his July 13, 2010, brain injury. In

18

Kuelbs's opinion, G. sustained a brain trauma most likely caused by shaking, which led to his subdural hemorrhage, retinal hemorrhages and his seizures at Rady.

During his interview with Lawson, Palacio stated he was really frustrated after 45 minutes of G.'s crying and, while holding G. very tightly, he shook his whole upper body. A videotape of Palacio's demonstration of how he held and moved with G. was shown to the jury. Palacio told Monge he believed his son's condition was due to his (Palacio's) behaviors, and he was going to try to learn a way to deal with his frustrations.

The above evidence is substantial evidence to support a finding by the jury that Palacio's actions (i.e., shaking his whole upper body while holding G. very tightly and/or pressing G.'s face twice into his chest to muffle the baby's crying) were willful and likely to produce great bodily harm or death, and as a result G. suffered unjustifiable physical pain or mental suffering. There is substantial evidence to support a finding that Palacio's shaking of his body while holding G. caused G.'s subdural hematoma and retinal hemorrhages. In addition, there is substantial evidence to support a finding that Palacio's action in holding G. very tightly to his chest did, in effect, smother him and cause him to stop breathing and suffer a hypoxic ischemic injury. While at Rady, G. had absent stare seizures, and CT scans and MRIs showed his brain was swelling and suffered a death of brain tissue. Although Kuelbs could not determine whether G.'s hypoxic injury was caused by his brain trauma and resulting seizures or by a separate event like smothering/suffocation, his hypoxic injury was consistent with Palacio pressing G. into his chest until the baby stopped breathing. There is substantial evidence to support a

19

finding by the jury that Palacio's willful actions on July 13, 2010, caused G.'s subdural hematoma and retinal hemorrhages, as well as his hypoxic injury.

The jury was not required to accept the alternative explanations provided by Palacio's experts regarding other possible causes of G.'s injuries. To the extent Palacio argues there is substantial evidence to support contrary findings by the jury and cites evidence and inferences therefrom that would have supported a defense verdict, he misconstrues and/or misapplies the substantial evidence standard of review. Furthermore, to the extent California courts may have recognized Palacio's theory of "equal circumstantial support" (see, e.g., *U.S. v. Flores-Rivera* (1st Cir. 1995) 56 F.3d 319, 323; *Cosby v. Jones* (11th Cir. 1982) 682 F.2d 1373, 1383),[4] our review of the whole record does not support application of that theory in this case. The evidence in this case, when viewed most favorably to the verdict, does *not* give equal or nearly equal circumstantial support to a theory of guilt or a theory of innocence of felony child abuse. (Cf. *U.S. v. Flores-Rivera, supra*, 56 F.3d at p. 323.)

II

*Motion for Evidence Code Section 402 Hearing and Purported Discovery Error*

Palacio contends the trial court erred by denying his request for an Evidence Code section 402 hearing on the foundation for the opinions of the prosecution's expert

---

[4] Palacio does not cite, and we are unaware of, any California case adopting that theory.

20

witnesses and/or by not requiring the prosecution to comply with its section 1054.1 discovery obligations regarding its witnesses.

A

On January 3, 2013, Palacio filed motions in limine, including a motion requesting an Evidence Code section 402 hearing to allow him to examine the prosecution's experts, except for Villarroel. He argued:

> "The defense anticipates the prosecution will be relying on the expert opinion of medical doctors to go beyond specific treatment findings and will express opinions about the cause of the child's injuries. Aside from Dr. Villarroel, the defense has not received any formal reports or reference to the basis for the anticipated expert opinion(s), rather, only a mention to 'the literature.' In contrast, the prosecution possesses detailed reports by both potential defense experts with a bibliography of the medical literature they relied upon in reaching their opinions and conclusions. Consequently, *Mr. Palacio requests a hearing pursuant to Evidence Code sections 402 and 403 in order to examine the proposed experts on the basis of their opinions*. Such procedure is the only effective way for the defense to ultimately conduct a meaningful cross-examination regarding the witnesses' opinions. *See generally* Evidence Code § 721.
>
> "Furthermore, the defense is entitled to evaluate whether 'the literature' relied upon by the expert(s) are well-recognized and accepted professional treatises, book[s] or articles in line with the *Kelly* test. [Citations.] [¶] Thus, Mr. Palacio requests that the court permit *voir dire* of the prosecution's proposed expert(s) outside the presence of the jury prior to opening statements." (Italics added.)

At the hearing on Palacio's motion for an Evidence Code section 402 hearing, he initially requested a hearing for all of the prosecution's experts, except for Villarroel-- who had testified at the preliminary hearing and provided a three-page report. He subsequently stated he did not need to examine Reilly and Vandenburg based on the

21

assumption they would not be giving opinions on causation. The prosecutor represented that Villarroel would testify only as G.'s treating physician, and "Dr. Kuelbs is going to be our expert." Palacio stated he did not have anything on Kuelbs. The prosecutor disagreed, stating he had the report provided by Villarroel, "which essentially Dr. Kuelbs wrote. He has our follow-up meeting with her acknowledging that fact, and . . . the testimony of Dr. Villarroel, which is going to be pretty much the same as Dr. Kuelbs with the additional information." The prosecutor further represented: "Dr. Kuelbs will be the only doctor who will give opinions . . . that this is a shaken baby, smothered baby. I think Dr. Dwek talks a little bit about the brain findings. I have provided his PowerPoint he has prepared to the defense in discovery this morning." Palacio confirmed that he had received a one-page report from a prosecution investigator in which Dr. Kuelbs stated she worked with Villarroel, assisted Villarroel in writing the report, and agreed with all the report's conclusions. Palacio argued the Kuelbs/Villarroel report states there is no basis in literature that an infection can cause a subdural hematoma or retinal hemorrhages like G.'s, but does not cite any supporting medical literature for that opinion. Palacio argued: "In order to have an effective cross-examination . . . , we need to know, at least to a certain degree, the foundation for these witnesses' opinions outside the presence of the jury, whether that's through a detailed report or whether that is through [an Evidence Code section] 402 hearing." The prosecutor replied, noting the reports of Palacio's experts (i.e., Weinraub and Barnes) contained little, if any, citations of medical literature in support of their opinions.

The trial court denied Palacio's motion for an Evidence Code section 402 hearing, stating: "I think you [Palacio] have enough to go forward with. You are going to have defense witnesses you are going to call and you can get a copy of the transcript [of Kuelbs's trial testimony]. You can show it to your expert and if there's something deficient in what she [i.e., Kuelbs] says, then your expert will point it out." Palacio asked the court for clarification that his request for an Evidence Code section 402 hearing "as it relates to Dr. Kuelbs" was denied. The court replied, "Yes."

B

"[A]ll court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115 [(i.e., §§ 1054 et seq.)]." (*In re Littlefield* (1993) 5 Cal.4th 122, 129.) The reciprocal discovery obligations of the prosecution and a criminal defendant are set forth in, respectively, sections 1054.1 and 1054.3. Section 1054.1 provides:

> "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies:

> "(a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] . . . [¶]

> "(f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, *including any reports or statements of experts made in conjunction with the case,* including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (Italics added.)

23

Section 1054.5 provides the exclusive method for the court to enforce the parties' discovery obligations, stating:

> "(a)  No order requiring discovery shall be made in criminal cases except as provided in this chapter.  This chapter shall be the only means by which the defendant may compel the disclosure or production of information from prosecuting attorneys . . . .

> "(b)  *Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired materials and information.  If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order.*  Upon a showing that a party has not complied with Section 1054.1 or 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure.

> "(c)  The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted. . . ." (Italics added.)

Section 1054.7 provides: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. . . ."  If the evidence or other information required to be disclosed is discovered within 30 days of trial, it must be disclosed to the other party immediately.  (§ 1054.7; *People v. Verdugo* (2010) 50 Cal.4th 263, 280.)

Under section 1054.1, subdivision (f), the term "reports" includes handwritten notes of an expert in arriving at his or her expert opinion (*People v. Hajek and Vo* (2014)

58 Cal.4th 1144, 1233), and the term "statements" includes oral statements of a witness whether directly stated to counsel or orally communicated to counsel by an investigator or other third party (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 165-166). On appeal, we review a trial court's ruling on a discovery motion for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

Evidence Code section 400 et seq. provides procedures for determining the existence of a disputed preliminary fact on which the admissibility of evidence depends. In particular, Evidence Code section 402 provides:

> "(a)  When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article.
>
> "(b)  The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . .
>
> "(c)  A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

On appeal, we review a trial court's ruling on a party's request for an Evidence Code section 402 hearing for abuse of discretion. (*People v. Slocum* (1975) 52 Cal.App.3d 867, 888.)

C

To the extent Palacio asserts the trial court abused its discretion by denying his request for an Evidence Code section 402 hearing, we conclude he has forfeited or waived that assertion by not presenting any substantive legal analysis or argument showing the court erred.  "When an appellant fails to raise a point, or asserts it but fails to

support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) "Where a point is merely asserted by [appellant] without any [substantive] argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783.) "Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99; see *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2; *Bayside Auto & Truck Sales, Inc. v. Department of Transportation* (1993) 21 Cal.App.4th 561, 571.)

D

Palacio's primary, if not sole, argument appears to be that the trial court erred by not requiring the prosecution to comply with its discovery obligations under section 1054.1 by providing him with reports or statements of the prosecution's witnesses who were expected to express opinions at trial. However, as the People assert, Palacio forfeited or waived this argument by not complying with section 1054.5's prerequisites and not moving under section 1054.5 for a court order requiring immediate disclosure or other relief. Except as otherwise required by the United States Constitution, the parties' discovery obligations in a criminal case and court orders for discovery are governed by section 1054 et seq. (*In re Littlefield*, *supra*, 5 Cal.4th at p. 129.) Section 1054.5,

26

subdivision (b), provides: "*Before a party may seek court enforcement* of any of the disclosures required by this chapter, *the party shall make an informal request* of opposing counsel for the desired materials and information.  If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order."  (Italics added.)  Accordingly, a party may not seek a court order for disclosure unless that party has first made an informal request of opposing counsel for the desired materials and information.  The California Supreme Court has held that section 1054.5's required procedures for seeking court enforcement of the prosecution's discovery obligations under section 1054.1 do not violate due process of law.  (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 374.)  Palacio does *not* cite to, and we are unaware of, any document in the record on appeal showing he did, in fact, satisfy the requirement that he make an informal request of the prosecution for certain materials and information.  Absent that request, Palacio was not entitled to seek a court order under section 1054.5 for immediate disclosure of the materials and information or other remedy.  Furthermore, there is nothing the record showing Palacio waited the required 15-day period before filing a motion for immediate disclosure.  Therefore, to the extent Palacio's in limine motion sought relief under section 1054.5, the trial court did not err by denying that relief because he did not comply with its prerequisites of first making an informal request for such materials and information and waiting 15 days thereafter before filing his motion.  (§ 1054.5, subd. (b).)  Palacio, in effect, forfeited or waived any argument that the prosecution did not comply with its section 1054.1 discovery obligations.

We further note Palacio's in limine motion wholly omitted any reference to sections 1054.1 and 1054.5 and did not implicitly assert any violation of the prosecution's section 1054.1 discovery obligations. On the contrary, as the People assert, his motion expressly requested an Evidence Code section 402 hearing so that he could ascertain the foundations for any opinions the prosecution's experts might give at trial. That is a different issue than a section 1054.1 discovery issue. As noted above, section 1054.1, subdivision (f), requires the prosecution to disclose "any reports or statements of experts" whom the prosecution intends to call at trial. Palacio's in limine motion for an Evidence Code section 402 hearing did not assert the prosecution had failed to disclose any reports or statements of its experts. By not expressly or implicitly asserting below that the prosecution had violated its section 1054.1 discovery obligations, Palacio forfeited or waived any argument on appeal that the trial court erred by denying his motion for an Evidence Code section 402 hearing.

E

In any event, assuming arguendo Palacio implicitly asserted below that the prosecution violated its section 1054.1 discovery obligations and he satisfied the requirements of section 1054.5, subdivision (b), we nevertheless would conclude any violation of the prosecution's discovery obligations did not prejudice him. Palacio argues that, without disclosure by the prosecution of the expert opinions of Drs. Kuelbs, Dwek, and Bansal, he had no informed opportunity to prepare for, and cross-examine, those prosecution experts regarding their opinions and establish doubt that G.'s retinal hemorrhages were the product of shaken baby syndrome, and show they were instead the

28

product of accidental or other noninflicted trauma. In support of his argument, he filed a request for judicial notice, asking that we take notice of seven articles or studies published in medical journals. He states the purpose of his request is *only* to establish "the fact that these studies existed at the time of trial" and not for the truth of the facts asserted in those studies. However, Palacio does not persuade us the articles he submits qualify for judicial notice under either Evidence Code section 452, subdivision (g) or (h), or otherwise. Furthermore, we note those articles were not before the trial court at the time it decided Palacio's in limine motion. Accordingly, we deny Palacio's request for judicial notice and disregard the seven articles or studies submitted therewith in deciding this appeal. (Evid. Code, §§ 452, 459, subd. (a).)

Assuming arguendo there is some controversy or disagreement regarding the import of retinal hemorrhages and/or subdural hematomas in proving a baby has been shaken, Palacio's counsel had G.'s medical records and Villarroel's report (which Kuelbs apparently authored or co-authored) before trial, and therefore had notice the prosecution's experts would testify that G.'s retinal hemorrhages and subdural hematomas showed those injuries were most likely caused by nonaccidental trauma, such as shaking. Therefore, Palacio cannot reasonably assert his counsel was "blindsided" by the prosecution's failure to provide additional reports and statements of its experts pursuant to section 1054.1, subdivision (f). Furthermore, Palacio does not cite any medical literature on which Dwek and Bansal relied in forming their opinions and refers to only one article on which Kuelbs relied. At trial, Palacio's counsel cross-examined Kuelbs regarding that article and his defense experts refuted her opinion and the article on which

29

she relied. Even had the trial court granted Palacio's motion for an Evidence Code section 402 hearing regarding the prosecution's opinions and foundations for those opinions, it is not reasonably probable he would have obtained a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) In denying Palacio's motion for an Evidence Code section 402 hearing, the court stated his experts could review the trial transcript of the testimony of the prosecution's expert witnesses and then refute those opinions and/or foundations for those opinions when they subsequently testified for the defense. Palacio does not show that scenario would not allow him and his experts an opportunity to adequately prepare a defense to the testimony of the prosecution's experts. Furthermore, as discussed above, Palacio's experts (i.e., Weinraub and Barnes) testified extensively on the disputed issues of retinal hemorrhages and subdural hematomas and the diagnosis of shaken baby syndrome, but the jury presumably found the testimony of the prosecution's experts more persuasive. Palacio does not show he and his experts likely would have persuaded the jury to reach a different verdict had he received the Evidence Code section 402 hearing he requested. We conclude Palacio has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable result had the court granted his motion.[5] (*Watson, supra,* 46 Cal.2d at p. 836.)

---

[5] We reject Palacio's conclusory assertion, citing *Wardius v. Oregon* (1973) 412 U.S. 470, that the trial court's denial of his motion violated his federal constitutional right to due process of law. *Wardius* is factually and legally inapposite to this case.

*Admission of Navy Form*

Palacio contends the trial court erred by denying his Evidence Code section 352 motion to exclude evidence regarding a Navy form he signed that changed his former wife's address, and allowing the prosecutor to question him and argue to the jury based on that form.

A

Before trial, Palacio filed an in limine motion seeking an order precluding the prosecutor from referring to the fact he was married to another woman, Betsy Velasco, when G. was born and later injured. He argued that evidence was irrelevant. The prosecutor argued Palacio's marriage to Velasco was a fraudulent marriage to get a green card for her and military benefits for him. The prosecutor expressed doubt Palacio ever lived with Velasco, who was living in Illinois when G. was born. She argued that after the Naval Criminal Investigative Service (N.C.I.S.) began investigating this issue following G.'s birth, Palacio completed a Navy form changing Velasco's address to a false San Diego address. The prosecutor argued that evidence showed Palacio's moral turpitude and should be admitted if he testified at trial because it showed a pattern of dishonesty. Although Palacio argued that evidence should be excluded under Evidence Code section 352, the trial court disagreed and ruled the evidence would be admissible to impeach him if he testified at trial.

At trial, Palacio testified on direct examination that he had married Velasco in 2007 when he was stationed in Illinois. When he moved to San Diego, she moved with

him, but then she became homesick, they separated, and she returned to Illinois in 2009. In 2009, Palacio began dating Miriam, who became pregnant with his child (G.) that year. G. was born in April 2010. Palacio and Velasco divorced in January 2011.

On cross-examination, Palacio admitted he told Lawson he starting living with and having sex with Miriam in March 2008. He admitted he received a $150 per month housing allowance from the Navy because of his marriage to Velasco. Velasco was a Mexican citizen who received a Navy identification card and documentation based on her marriage to him. The prosecutor asked Palacio whether it was true he had never lived with Velasco, but he replied he had lived with her. The trial court sustained Palacio's objection to the prosecutor's question whether he was aware he could be court-martialed for adultery if the Navy learned he was married when he had a baby out of wedlock. The court then overruled Palacio's objection to the prosecutor's question whether he had concerns about his marriage and the fact the Navy would know he got married only for the benefits. Palacio replied, "That's not why I got married." He admitted that on July 22, 2010, he went to a Navy office and showed G.'s birth certificate to complete a Navy form making him a dependent. He denied giving anyone at the office information to change Velasco's address to a San Diego address. He testified he did not put that address change information on the Navy form himself and "[s]omeone else typed it up." He admitted that if the Navy form showed Velasco moved to San Diego on July 22, 2010, it would be incorrect. He denied changing Velasco's address on the Navy form. He stated that her address change on the form "[m]ust have been an error."

In rebuttal, the prosecution presented the testimony of Romy Christensen, an N.C.I.S. agent, who stated Exhibit No. 62 was an official Navy form, dated July 22, 2010, which added G. as Palacio's dependent and also changed Velasco's address to a San Diego address. It showed Palacio had signed the form, indicating he had reviewed it and that its information was correct. The signature on that form appeared similar to signatures on other Navy forms in Palacio's file.

In closing, the prosecutor argued the evidence showed Palacio lied when he testified he did not make the change to Velasco's address on the Navy form. Referring to the Navy form, she further argued in rebuttal that Palacio asked the jury to "listen to me when I sit on the stand and actually lie to you about filling out certain forms and statements that I made in the past."

B

We conclude the trial court did not abuse its discretion by admitting evidence regarding the Navy form that changed Velasco's address and allowing the prosecutor to argue based on that form that Palacio was lying when he stated he did not make that change. Contrary to Palacio's assertion, there *is* evidence to support a finding he requested the address change on the Navy form. The record shows Palacio went to the Navy office and showed G.'s birth certificate. The Navy form shows G. was added as Palacio's dependent and Velasco's address was changed to a San Diego address. The form bears a signature similar to signatures on other forms in Palacio's Navy file. Based thereon, the jury could reasonably infer, despite Palacio's denial, that he gave the Navy the information for, and requested, the address change for Velasco. The jury could

33

reasonably reject any other possible explanation for that address change (e.g., as Palacio suggests on appeal, a clerk's or computer error). Palacio did not present any testimony or other evidence showing the Navy office could have obtained Velasco's San Diego address from any source other than Palacio.

Based on the reasonable inference that Palacio did, in fact, request and make the change in Velasco's address on that Navy form, the prosecutor could properly argue, and the jury could reasonably infer, that Palacio was dishonest when he requested and made that address change on the form and later testified at trial that he did not do so. The trial court properly admitted the Navy form evidence as impeachment evidence showing moral turpitude and was properly used by the prosecutor to attack his credibility. (Evid. Code, § 780, subd. (e); cf. *People v. Harris* (2005) 37 Cal.4th 310, 337 [past criminal conduct involving moral turpitude that relates to veracity of witness is admissible to impeach that witness, subject to trial court's discretion to exclude under Evid. Code, § 352].) The trial court also properly overruled Palacio's objection and allowed the prosecutor to ask him whether he was concerned about repercussions from the Navy when he changed Velasco's address, which question was relevant to his credibility.[6]

---

[6]     Although Palacio also apparently challenges the trial court's overruling of his relevancy objection to the prosecutor's question whether he had concerns about his marriage and the fact the Navy would know he married only for benefits, he fails to show that question is irrelevant. Furthermore, to the extent he now asserts that question was improper as argumentative, he waived or forfeited that assertion by not timely objecting below on that ground.

Likewise, the prosecutor reasonably questioned Palacio about his marriage to Velasco, including whether he had ever lived with her.

Furthermore, to the extent Palacio asserts the prosecutor erred by arguing he was, in effect, a liar or perjurer, he waived or forfeited that challenge by not timely objecting below and requesting an admonition. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) In any event, we believe the prosecutor properly argued, in effect, that Palacio was not entitled to credence based on the Navy form and other evidence. (*People v. Pinholster* (1992) 1 Cal.4th 865, 948.)

In any event, assuming arguendo the trial court and prosecutor erred as Palacio asserts, we nevertheless would conclude he has not carried his burden on appeal to show it is reasonably likely he would have obtained a more favorable result had those errors not occurred. (*Watson, supra*, 46 Cal.2d at p. 836; *People v. Bain* (1971) 5 Cal.3d 839, 849 (*Bain*).) At most, he argues in conclusory fashion that the purported errors are prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the errors of which he complains do not implicate or involve his right to due process of law under the United States Constitution, which would invoke the more stringent standard for prejudicial error (see, e.g., *Chapman v. California* (1967) 386 U.S. 18, 24 [the People have the burden to show the federal constitutional error was harmless beyond a reasonable doubt] (*Chapman*).)

IV

*Claims of Prosecutorial Error*

Palacio contends the prosecutor committed prejudicial error in questioning

Bryson, Lawson and Weinraub.  Palacio properly characterizes his claims as asserting

prosecutorial "error" rather than "misconduct."  (*People v. Hill* (1998) 17 Cal.4th 800,

823, fn. 1.)

A

"A prosecutor's conduct violates the Fourteenth Amendment to the federal

Constitution when it infects the trial with such unfairness as to make the conviction a

denial of due process.  Conduct by a prosecutor that does not render a criminal trial

fundamentally unfair is prosecutorial misconduct under state law only if it involves the

use of deceptive or reprehensible methods to attempt to persuade either the trial court or

the jury."  (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  To preserve a claim of

prosecutorial misconduct or error, a defendant must timely object and request a curative

admonition unless an admonition would not have cured the harm caused by the

misconduct or error.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp*

(1999) 20 Cal.4th 826, 858.)

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial

misconduct or error does not require reversal of the judgment unless it was prejudicial

under state law, i.e., it is reasonably probable the defendant would have obtained a more

favorable verdict absent the misconduct or error.  (*People v. Bell* (1989) 49 Cal.3d 502,

534, 542 (*Bell*); *People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Crew*

36

(2003) 31 Cal.4th 822, 839.)  If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt.  (*Castillo*, at pp. 386-387, fn. 9; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324.)

"It is misconduct [i.e., error] for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means.  [Citation.]  But if the defense does not object, and the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct [i.e., error] has occurred.  [Citation.]  Therefore, a claim of misconduct [i.e., error] on this basis is waived absent a timely and specific objection during the trial." (*People v. Price* (1991) 1 Cal.4th 324, 481 (*Price*).)

Although a prosecutor is given wide latitude in vigorously arguing the People's case, the prosecutor may not misstate the law.  (*Bell, supra,* 49 Cal.3d at p. 538; *People v. Bandhauer* (1967) 66 Cal.2d 524, 529.)  The prosecutor "has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper.  Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." (*People v. Thomas* (1992) 2 Cal.4th 489, 526.)  "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.  [Citations.]  We recognize that the prosecutor 'may vigorously argue his case and is not

37

limited to "Chesterfieldian politeness" ' [citations], but the bounds of vigorous argument do not permit appeals to sympathy or passion such as that presented here." (*People v. Fields* (1983) 35 Cal.3d 329, 362-363, fn. omitted.)

"[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Even if an error could not be cured by an admonition to the jury, reversal of a defendant's conviction is warranted only if on the whole record the error resulted in a miscarriage of justice. (*Bell*, *supra*, 49 Cal.3d at p. 535.)

B

*Bryson*. Palacio asserts the prosecutor prejudicially erred by questioning Bryson whether he told her he had smothered G. As discussed above, Bryson interviewed Palacio after G. was taken to Rady. She wrote a report regarding that interview. On direct examination, the prosecutor asked Bryson whether Palacio told her he pressed G.'s face into his chest. Bryson replied, "No." When asked whether Palacio told her about muffling G.'s cries, Bryson answered, "I don't believe so." On cross-examination, Palacio's counsel asked Bryson whether Palacio had told her that G.'s cries that night were different in that they were high-pitched almost like he was in pain. Bryson answered that Palacio told her G.'s cries were different, more high-pitched, and almost like he was in pain. On redirect examination, the prosecutor asked Bryson whether Palacio told her the reason G.'s cries became high-pitched was because he had just

38

smothered him. Bryson replied, "No." The prosecutor then asked Bryson whether Palacio told her that after G.'s cries became high-pitched, he smothered G. a second time. Palacio's counsel objected to that question as argumentative. After the trial court overruled that objection, Bryson replied, "No."

Palacio asserts the prosecutor erred by asking Bryson the two questions on redirect examination regarding whether he told her he smothered G. However, assuming arguendo Palacio's counsel adequately objected to those questions, we nevertheless conclude Palacio has not carried his burden on appeal to show those prosecutorial errors caused a miscarriage of justice (i.e., it is reasonably probable he would have obtained a more favorable result had the prosecutor not so erred).[7] (*Bell*, *supra*, 49 Cal.3d at pp. 534-535, 542; *People v. Castillo*, *supra*, 168 Cal.App.4th at p. 386; *People v. Crew*, *supra*, 31 Cal.4th at p. 839.) Rather, he simply argues in conclusory fashion that the court clearly erred by allowing "such prejudicial 'questions.' " Furthermore, based on our review of the record, we believe the jury disregarded the prosecutor's apparent argumentative and improper questions (for which the prosecutor apparently did not have a good faith belief would be answered in the affirmative) as not statements of facts based on evidence after Bryson answered those questions and denied that Palacio told her he smothered G.

---

[7] Palacio apparently does not, nor could he reasonably, argue those questions violated his federal Constitutional right by "infect[ing] the trial with such unfairness as to make [his] conviction a denial of due process." (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

C

*Lawson*.  Palacio asserts the prosecutor erred by allowing Lawson to falsely testify that he (Palacio) shook G. and by falsely arguing to the jury that "there was shaking."  A prosecutor has a "constitutional duty to correct false testimony."  (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1384.)  It is also improper for a prosecutor to argue facts not in evidence.  (*People v. Hill*, *supra*, 17 Cal.4th at pp. 827-828.)

Lawson's recorded interview of Palacio was played for the jury.  As described above, during that interview Palacio stated he was jumping around and his whole upper body was shaking back and forth while he tightly pressed G. against him.  Palacio stated he pressed G. into his chest to stop him from crying and did so again, even harder, after G.'s "scream from hell."  Palacio agreed with Lawson's description of that conduct as "muffling" G.'s crying.  The jury also viewed the videotapes of Palacio's demonstration of his actions while holding G.

On direct examination, the prosecutor asked Lawson what Palacio told her he did after the "scream from hell."  Lawson replied:

> "He describes again moving with the child, and he describes himself shaking.  He describes shaking the baby, there's a physical movement also as he [is] giving the description.  And that he again placed baby G.'s face into his chest."

The prosecutor asked Lawson whether Palacio described his whole body as shaking.  Lawson replied, "Mr. Palacio described . . . his whole body as shaking, yes."

Palacio asserts the prosecutor did not correct Lawson's purported false testimony that he told her he shook G. and smothered him.  However, as the People argue, Palacio

40

waived or forfeited that claim by not timely objecting to that purported failure by the prosecutor. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1124 (*Guerra*); *Price*, *supra*, 1 Cal.4th at p. 481.) In any event, we conclude the prosecutor did not err as Palacio asserts. In the context of Lawson's testimony, her statement that Palacio "describe[d] shaking the baby" was not false. Before that statement, Lawson testified Palacio told her "[h]e describes again moving with the child, and he describes himself shaking." She then gave the challenged testimony that "[h]e describes shaking the baby, there's a physical movement also as he [is] giving the description." A few questions later, the prosecutor clarified Lawson's testimony, asking: "You said that [Palacio] had described his whole body as shaking?" Lawson answered: "Mr. Palacio described . . . his own body as shaking, yes." To the extent Lawson's initial testimony may have been misleading regarding what Palacio stated he did, the prosecutor clarified that ambiguity and the jury presumably understood that Lawson testified Palacio told her his whole body was shaking as he held G. and not that he performed any independent act of separately shaking G. Therefore, there was no false testimony by Lawson for the prosecutor to correct.

Palacio also apparently challenges Lawson's testimony supporting a "smothering" or "muffling" event. However, he does not cite to the record any use of the term "smothering" by Lawson. Furthermore, although Lawson admitted she was the first to use the term "muffling" when interviewing Palacio, that description was reasonable and was, in effect, adopted by Palacio during the interview. According to Lawson (and as confirmed by the recording and transcript of the interview), Palacio told her he held G.

41

tightly against his chest twice, trying to stop his crying, but making sure his nostrils were visible. Palacio also demonstrated for her how he held G. Lawson reasonably inferred Palacio's conduct was an attempt to muffle G.'s cries. Accordingly, Lawson's use of that term during the interview and at trial was not false testimony and the prosecutor did not err by not correcting it.

Finally, Palacio argues, again in conclusory fashion, that the prosecutor erred by arguing to the jury that he "admitted to Detective Lawson . . . he . . . pressed the baby into his chest and the baby stopped breathing and there was shaking . . . [¶] . . . and admitted hurting his son." However, as the People argue, Palacio waived or forfeited that claim by not objecting below. (*Guerra, supra*, 37 Cal.4th at p. 1124; *Price, supra*, 1 Cal.4th at p. 481.) In any event, the evidence, as described above, supports that argument by the prosecutor. Lawson testified Palacio told and/or showed her how he pressed G. into his chest, that G. stopped breathing shortly thereafter, and that his whole upper body shook while he was holding G. The prosecutor did not err by so arguing to the jury.

Assuming arguendo the prosecutor erred as Palacio asserts, we nevertheless would conclude he has not carried his burden on appeal to show it is reasonably likely he would have obtained a more favorable result had those errors not occurred. (*Watson, supra*, 46 Cal.2d at p. 836; *Bain, supra*, 5 Cal.3d at p. 849.) At most, he argues in conclusory fashion that the purported errors are prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the errors of which he complains do not implicate or involve his right to due process of law under the United States Constitution, which would

42

invoke the more stringent standard for prejudicial error (see, e.g., *Chapman*, *supra*, 386 U.S. at p. 24).

D

*Weinraub*. Palacio asserts the prosecutor erred by asking Weinraub if he was aware Barnes had changed his mind about the age of G.'s chronic bleed because the evidence did not support that factual assertion. On direct examination by Palacio, Weinraub testified the July 14, 2010, MRI showed mixed subdural hematoma, called intermediate density, that had both acute and chronic bleeds. Weinraub testified that G. had an "acute on chronic bleed" on that date. On cross-examination, the prosecutor asked Weinraub: "[A]re you aware Dr. Barnes changed his opinion last night to say that the chronic bleed is three to seven days old?" Palacio's counsel objected, arguing the question misstated the evidence. The trial court overruled the objection. Weinraub then answered: "I would have to look at that."

Barnes later testified that the July 14, 2010, CT scan showed different blood collections that could be at least two to three weeks old and some less than two weeks old. He also testified a side view of the scan showed there was blood that looked less than two to three days old and blood at least two to three days old. He testified the range was "somewhere between three and seven days old." He further testified that, after he reviewed Dwek's PowerPoint presentation, he amended his own report dated December 22, 2012, to add six words describing the July 14, 2010, MRI.

Assuming arguendo the prosecutor erred by misstating the evidence when she asked Weinraub whether he was aware "Barnes changed his opinion last night to say that

43

the chronic bleed is three to seven days old" (referring to Barnes's addendum to his report), we conclude Palacio has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable result had that error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Bain*, *supra*, 5 Cal.3d at p. 849.) At most, he argues in conclusory fashion that the purported error was prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the error of which he complains does not implicate or involve his right to due process of law under the United States Constitution, which would invoke the more stringent standard for prejudicial error (see, e.g., *Chapman*, *supra*, 386 U.S. at p. 24). Based on our review of the whole record, we conclude the prosecutor's assumed error in questioning Weinraub was harmless under the *Watson* standard.

Palacio also asserts the prosecutor erred by impeaching Weinraub with boxes in the courtroom that were not in evidence. On direct examination by Palacio, Weinraub testified he had reviewed certain records and reports regarding G.'s medical treatment and care. On cross-examination, the prosecutor asked him how many pages of discovery he had reviewed. Weinraub replied, "Certainly over 1,000." Later, Weinraub admitted he had not seen a certain neurosurgery report included in the discovery documents. The prosecutor referred to a cart in the courtroom, asking Weinraub: "And looking over at the cart which is in the well which contains four banker's boxes full of documents, those are all the records from [Rady] Children's Hospital, over 10,000 pages. Did you review those?" Weinraub replied: "I did not review 10,000 pages of records." He admitted: "I wasn't provided with 10,000 pages of documents from any source." Later, after

44

Weinraub testified G. had a bleeding disorder because he had a low platelet count and that Rady had not completed a work up or final diagnosis, the prosecutor asked him how he could know that and asked: "Did you review those 10,000 pages?" Weinraub admitted he did not know whether a bleeding test had been performed.

During closing argument, the prosecutor argued Kuelbs was the only expert witness who had reviewed the 10,000 pages of medical records. Palacio's counsel argued Weinraub's opinion should not be discredited because he did not read all of the documents in those boxes. His counsel questioned what was in those boxes and where they came from. In rebuttal argument, the prosecutor argued Weinraub admitted he had not looked at, or even received, all 10,000 pages of discovery.

Palacio argues the prosecutor had no foundation for her questions about the boxes. However, as the People argue, Palacio waived or forfeited his claims by not objecting below. (*Guerra*, *supra*, 37 Cal.4th at p. 1124; *Price*, *supra*, 1 Cal.4th at p. 481.) Assuming arguendo the prosecutor erred as Palacio asserts, we nevertheless would conclude he has not carried his burden on appeal to show it is reasonably likely he would have obtained a more favorable result had those errors not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Bain*, *supra*, 5 Cal.3d at p. 849.) At most, he argues in conclusory fashion the purported errors are prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the errors of which he complains do not implicate or involve his right to due process of law under the United States Constitution, which would invoke the more stringent standard for prejudicial error (see, e.g., *Chapman*, *supra*, 386 U.S. at p. 24). Furthermore, because Palacio has not carried his burden to show he was

45

prejudiced by the prosecutor's purported errors, he likewise has not carried his burden to show he was denied his constitutional right to effective assistance when his counsel did not object to those errors. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 697 [if defendant fails to show that absent defense counsel's deficient performance there is a reasonable probability he or she would have obtained a more favorable result, the defendant has not shown he or she was denied effective assistance of counsel and the conviction must be upheld]; *People v. Frye* (1998) 18 Cal.4th 894, 978-979.)

V

*Admission of G.'s Photograph*

Palacio contends the trial court erred by denying his Evidence Code section 352 motion and admitting into evidence a photograph showing G.'s cranial bolt taken while he was hospitalized at Rady.

A

Palacio moved in limine to exclude all photographs of G., arguing they had little probative value or relevance and could inflame the passions of the jurors and had a substantial danger of prejudicing him. During a hearing on the motion, the prosecutor argued that Exhibit 17, a photograph of G. showing the cranial bolt in his head, was relevant to show great bodily injury and help the jury to understand his care and treatment. Palacio objected to that photograph, arguing it would be prejudicial and allow the jurors to let their emotions into the case. The trial court overruled the objection, finding the photograph was relevant to show what sort of medical treatment G. received and help the jurors understand G.'s injuries and the concept of the bolt. The court found

46

the photograph's probative value outweighed its prejudicial effect.  At trial, Villarroel identified the photograph as depicting the bolt placed in G.'s head.  The court admitted the photograph into evidence.

## B

"When a defendant makes a claim that photographs of the victim are unduly gruesome or inflammatory, their admission lies within the broad discretion of the trial court."  (*People v. Benavides* (2005) 35 Cal.4th 69, 96.)  The trial court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.  (*Ibid*.; *People v. Heard* (2003) 31 Cal.4th 946, 976.)  Evidence is prejudicial when it uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value.  (*People v. Hart* (1999) 20 Cal.4th 546, 616.)

## C

We conclude the trial court did not abuse its discretion under Evidence Code section 352 by admitting the photograph of G.  The court correctly found the photograph was relevant to show what sort of medical treatment G. received and help the jurors understand G.'s injuries and the concept of the bolt.  It also found its probative value outweighed its prejudicial effect.  Based on our review of the photograph, we believe the court properly exercised its discretion by admitting it.  Although the photograph may be disturbing or unsettling for some to view, it is not unduly gruesome so as to inflame the passions of the jurors.  (Cf. *People v. Benavides, supra*, 35 Cal.4th at p. 96.)  Furthermore, contrary to Palacio's apparent argument, the photograph was not cumulative

of other evidence (e.g., Villarreal's testimony). Although Villarreal testified regarding the cranial bolt inserted into G.'s head, the photograph helped to clarify that testimony for the jurors. (*Ibid*.)

In any event, assuming arguendo the trial court erred by admitting that photograph, we nevertheless would conclude Palacio has not carried his burden on appeal to show it is reasonably likely he would have obtained a more favorable result had that error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Bain*, *supra*, 5 Cal.3d at p. 849.) At most, he argues in conclusory fashion that the purported error was prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the purported error does not implicate or involve his right to due process of law under the United States Constitution, which would invoke the more stringent standard for prejudicial error (see, e.g., *Chapman*, *supra*, 386 U.S. at p. 24.) None of the cases cited by Palacio are apposite to this case or persuade us to reach a contrary conclusion. (See, e.g., *People v. Burns* (1952) 109 Cal.App.2d 524; *People v. Marsh* (1985) 175 Cal.App.3d 987; *People v. Ellis* (Colo. 1978) 589 P.2d 494.)

VI

*Cumulative Error*

Palacio finally contends the cumulative prejudicial effect of all of the trial court's and prosecutor's errors require reversal of his conviction. However, he argues only in conclusory fashion that the purported errors were cumulatively prejudicial under the *Watson* standard. Furthermore, contrary to Palacio's assertion, the purported errors do not implicate or involve his right to due process of law under the United States

48

Constitution, which would invoke the more stringent standard for prejudicial error (see, e.g., *Chapman*, *supra*, 386 U.S. at p. 24). None of the cases cited by Palacio are apposite to this case or persuade us to reach a contrary conclusion. Based on our consideration of all of the errors Palacio asserts, we conclude the cumulative prejudicial effect of those purported errors was harmless (i.e., it is not reasonably probable he would have obtained a more favorable result had those errors not occurred). (*People v. Williams* (2009) 170 Cal.App.4th 587, 646; *Watson*, *supra*, 46 Cal.2d at p. 836.)

## DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


NARES, J.