[Crim. No. 15230. In Bank. Oct. 18, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM L. BAIN, Defendant and Appellant.

840

**COUNSEL**

Sheldon Portman, Public Defender, Terry A. Green and Rose Elizabeth Bird, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PETERS, J.**—William L. Bain was convicted by jury of forcible rape (Pen. Code, § 261, subd. 3), false imprisonment (Pen. Code, § 236), oral copulation (Pen. Code, § 288a) and possession of a concealed dirk or dagger (Pen. Code, § 12020). The jury found him not guilty of kidnaping (Pen. Code, § 207). He appeals from the judgment sentencing him to concurrent terms in state prison for each of the convictions.

The testimony of the prosecutrix, a 24-year-old married woman with three children, may be summarized as follows: On the morning of January 26, 1969, she was on a Greyhound bus which left the San Francisco

terminal about 2 a.m., bound for San Jose. She was traveling to Moffett Field, a naval installation near San Jose, where her brother was stationed and lived with his wife. The brother had agreed to meet her at the Moffett Field bus stop.

The defendant boarded the bus at the San Francisco terminal and asked to sit next to her; she responded, "I don't care." He asked about the book she was reading and she showed him the title on the cover. Defendant then asked where she was going and she replied "Moffett Field."

He asked about her nationality and she replied "I am Samoan." After reading awhile, she fell asleep only to be awakened by a pressure on her ribs from defendant's elbow. She said "Excuse me" and moved closer to the window. These were the only events while both were on the bus.

When the bus arrived at Moffett Field, she got off and discovered that her brother was not there. She said out loud "Is there a phone booth around here?" and defendant, who had also gotten off the bus, directed her to a nearby booth. She was aware that defendant was following her because her suitcase had twice hit his leg. In the phone booth she started to dial her brother's number but defendant interrupted by pushing open the door of the booth. Thinking that he wanted to use the phone, she removed her money and went to another nearby booth.

Defendant again pushed in the door of the booth. This time, however, he brandished a knife in front of her face and threatened to slash her unless she came along with him. With the knife placed in her ribs, she went with defendant to a parking lot, where he tried to enter several parked cars. When these attempts proved unsuccessful, he took her to a dark alcove behind a restaurant.

In the alcove, defendant forced the prosecutrix to engage in three separate acts of sexual intercourse and one act of oral copulation.

Under cross-examination, the prosecutrix stated that she had not been wearing her wedding ring on the night of the incident. She explained that she had removed the ring while washing clothes that day and had forgotten to put the ring back on her finger. She did not attempt to run from defendant, even though he had, at one point, walked approximately 10 feet away from her; his knife was in his pocket then and there were houses and a motel nearby. Nor did she call for help, even though she had passed by two persons while defendant was following her.

Defendant's testimony may be summarized as follows: He met the prosecutrix at the bus terminal and attempted to "pick her up." After conversing

about the book she was reading and her Samoan nationality, she agreed to allow him to accompany her on the bus to San Jose.

During the time they were on the bus together, he asked her if she was married and she said no; they talked and engaged in necking and petting. This included kissing and defendant's placing his hand on her leg. She was "responsive."

Defendant and the prosecutrix got off the bus together, with him carrying her suitcase. After she indicated that she did not want him to accompany her to her relative's home, they agreed to find a secluded place to "make out." He tried to find an open car but could not, and they went to the restaurant alcove, where they engaged in a single act of sexual intercourse. She willingly engaged in the act. In his version of the events, defendant made no mention of an act of oral copulation.

Just about the time that the sexual encounter ended, Police Officer Steven Clifford, who was patrolling with his police dog, came upon prosecutrix and defendant. The policeman testified that he heard voices coming from the restaurant alcove, where he observed a man and a woman standing. When he called upon them to step away from the building, the defendant came forward, saying, "This is only my date, man. We're not doing anything wrong. She's just my date."

The prosecutrix, who had been standing in the alcove, then ran up to where he was standing. In the officer's words, she "was very upset, crying . . . . She grabbed ahold of me and began to pull on my arm and choke me around the neck. Continuously shouting, 'He's going to hurt me. He's raped me and look out, he's got a knife.' "

Officer Clifford further testified that he arrested and searched defendant. He found a knife in the pocket of defendant's trench coat. According to Officer Clifford, the blade of the knife, which opens like a pocketknife and locks in place, was open in the locked position; and the point was facing upward in defendant's pocket. Defendant, on the other hand, testified that the knife was closed when Officer Clifford found it. He claimed that he carried the weapon for protection in the dangerous area of San Francisco where he lived. He further stated that the prosecutrix had seen the knife on the bus, when it slipped out of his left hip pocket and he placed it in the trench coat pocket.

The knife is 11 inches long overall. Its blade, which measures slightly less than five inches long, is symmetrical. Although the sides are beveled the entire length on one side and half way down the other side, the sides are dull. The blade comes to a point and can be locked into an open posi-

tion. There are handguards of approximately one-half inch in length, located where the blade meets the handle.

In the course of trial, the prosecutor asserted before the jury that the defendant and his counsel had fabricated the "pick-up" story; he stated that he, as a black man, would not be prosecuting a black defendant unless he personally believed the man to be guilty; he attacked the integrity of the defense attorney and the office of the public defender; and he referred repeatedly to racial matters.

Defense counsel objected to the statements about a fabricated defense and the prosecutor's expression of personal belief in defendant's guilt. He did not object to the attack on his integrity; nor did he object to the racial comments. Defense counsel also made comments about the racial aspects of the case.

The claim of fabrication was made by the prosecution as early as the *voir dire* when the prosecutor alluded to the three-month period between the incident and the trial and asked a prospective juror whether he was aware that the defendant "had a lot of chance to think about it and can state anything he wants to, . . ." The juror indicated that he did not understand the question. So, the prosecutor said, "In other words, this thing occurred [three months ago] . . . . He's had a lot of time to get a lawyer." This implication of a drummed up defense story passed without objection by the public defender.

However, when the prosecutor expanded on the theme in his closing argument, he was challenged by defense counsel. The prosecutor stated to the jury: "You might say to yourself, 'The defendant's got a good story.' Did you think he was going to come in here without a good story? He's had how long to prepare . . . . I don't want to imply that my colleague here, that he told him what to say, but he has the assistance of a lawyer."

When defense counsel objected after this statement, the judge did not reprimand the prosecutor, instead he told the jury that defense counsel had "certainly acted properly as an attorney and he's defending his client well. He's not drumming up any stories." The prosecutor responded "[W]hat I said was that did they expect him to come in without a story? And I've been a lawyer long enough that people don't hire lawyers just to give them money to make them rich. I'm saying that merely because he had a lawyer—that's what I'm saying. Now if that shoe fits, he can wear it."

The public defender renewed his objection and moved for a mistrial,

which the judge denied, telling the jury that defense counsel had conducted himself "properly and ethically" at all times.

The prosecutor returned to the theme of a fabricated story in his rebuttal argument by drawing attention to the defendant's use of the word "ejaculate" when describing his sexual relations with the prosecutrix. He left the clear impression with the jury that the defendant had been coached, by commenting "I wonder where he picked up that word."

The prosecutor stated several times that he believed the defendant to be guilty of the crimes charged. He wove these statements into a tight web with comments referring to the fact that he and defendant were both black. This occurred after the public defender suggested, in his closing argument, that the brother of the prosecutrix had not been called to explain the apparent inconsistency in her story about the arranged meeting at the bus stop because "the police say to themselves . . . 'Well, we've got the nigger rapist and that should do it until trial,' . . ."

Evidently in response to this comment by the public defender, the prosecutor in his rebuttal stated to the jury: "Now let me tell you something: Do I look white to you? As I look at this man, it seems to me that I am blacker than he is. Now do you think that I didn't read the report before the Complaint was signed? Do you think if I really thought he was innocent that—" Defense counsel objected at this point but after a short discussion, the trial judge told the prosecutor to proceed. So, the prosecutor went on: "[I]f I thought the evidence in this case didn't support my theory, do you think I would prosecute this man? . . . Don't you think I could go out on my own and make money? There is one other Black lawyer in this whole town besides me; so . . . do you think in your own minds that I would be prosecuting the case just because of that? I don't believe it. The defendant doesn't. . . . Bain and I understand each other. We came out of the same kind of area. He understands me, and he understands I don't approve of this kind of conduct, too."

In addition to these comments which were objected to, the prosecutor made numerous other remarks about race and the defense counsel's lack of integrity, which defense counsel did not object to. For example, he referred to defense counsel as the "Golden Boy." He also vilified the public defender's office several times: "I understand if you throw a brick at a pack of dogs and you hit one of them, he'll holler." "These guys never change. All defense counsels get together and discuss their tactics and do the same thing. Do you think this is the first case I tried against him?"

Defense counsel was also embroiled in this rancorous exchange; he told

the prosecutor to "shut up," as the latter was voicing an apparently valid objection to a question on cross-examination.

The acrimonious clash of personalities between counsel is further illustrated by the prosecutor's other comments about race. For example, he commented on the defense counsel's cross-examination of the complainant concerning the reason why she had not been wearing her wedding ring on the night of the incident. The prosecutor stated: "[Defense counsel] places a lot of emphasis on rings. . . . I remember my mother who was married 46 years and never owned a ring, and . . . I . . . never even owned a pair, . . . Now does that mean that we are something different, that we are animals because we don't wear rings? But the Golden Boy says you're supposed to have rings if you're married. White people always have them."

The trial judge offered no admonition to the jurors during the entire trial, except to say that defense counsel was not "drumming up any stories." In the course of its instructions, the court stated that counsel's summation was not evidence.

██ ██ The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct. (*People* v. *Nelson*, 224 Cal.App.2d 238, 254 [36 Cal.Rptr. 385]; *People* v. *Talle*, 111 Cal. App.2d 650, 674-677 [245 P.2d 633]; *People* v. *Nolan*, 126 Cal.App. 623, 640 [14 P.2d 880]; *People* v. *Charlie*, 34 Cal.App. 411, 414-415 [167 P. 703]; see Annot., 99 A.L.R.2d 508, 577-579.) At first, the prosecutor merely hinted that the defendant and his counsel might have fabricated the defense during the interval between arrest and trial. Although he then disclaimed any intent to so imply, he immediately followed the seeming disclaimer with "but he has the assistance of counsel." After the judge said that defense counsel was not "drumming up any stories," the prosecutor compounded his own misconduct by quipping, "if that shoe fits, he can wear it."

There is no evidence to support the claim that defense counsel fabricated the defense. To the contrary, the evidence is undisputed that defendant, prior to his arrest, claimed that the complaining witness was his "date." Although wide latitude is given the prosecutor to draw any reasonable inference from the evidence (*People* v. *Beivelman*, 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913]), there is no basis for the claim of fabrication by defense counsel, and the prosecutor's comment to that effect must be deemed misconduct.

■ Nor may a prosecutor express a personal opinion or belief in a defendant's guilt, where there is substantial danger that jurors will interpret this as being based on information at the prosecutor's command, other than evidence adduced at trial. The danger is acute when the prosecutor offers his opinion and does not explicitly state that it is based solely on inferences from the evidence at trial. In *People* v. *Kirkes* (1952) 39 Cal.2d 719 [249 P.2d 1], this court said: "The classic expression of the rule appears in this oft-quoted statement in *People* v. *Edgar,* 34 Cal.App. 459, 468 [167 P. 891]: 'When the district attorney declared that he would not prosecute any man he did not believe to be guilty he thereby wrongfully placed his personal opinion of the guilt of the defendant in evidence in the case. He was privileged to argue to the jury that it was his opinion formed from deductions made from the evidence adduced at the trial that the defendant was guilty of the crime charged [citation]; but his declaration to the jury that he would not prosecute any man whom he did not believe to be guilty was tantamount to an assertion that he believed in the guilt of the defendant at the very inception of the prosecution; and necessarily such belief must have been founded upon the result of the district attorney's original and independent investigation of the charge, and therefore in all likelihood was based, in part at least, upon facts which did not appear and which perhaps could not have been shown in evidence.' " (*People* v. *Kirkes, supra,* 39 Cal.2d 719, 723-724.)

■ In the instant case, the prosecutor did not merely state his opinion, based on inferences drawn from the evidence. He first remarked that he personally believed the defendant not to be innocent. Defense counsel objected but the court did not sustain the objection and told the prosecutor to proceed. Although his next comment was properly phrased, referring to his belief that the "evidence" showed defendant's guilt, the thrust of the following argument to the jury was that he would not be prosecuting the case unless he personally believed the defendant to be guilty. He stated that he would not have "signed the complaint" had he not been convinced that the defendant was not innocent of the crime. Since the complaint was signed *before trial,* the statement was bound to impress the jury in the precise way forbidden by *Kirkes.* (*People* v. *Quigley* (1958) 157 Cal. App.2d 223, 229 [320 P.2d 936]; *People* v. *Beal* (1953) 116 Cal.App.2d 475, 477 [254 P.2d 100].)

After the trial judge indicated that he would not exercise any control over the prosecutor's statements of personal opinion, the prosecutor, in effect, asked the jury to give credence to his belief in defendant's guilt from the inception of the case, because he, as a black man, "understood" black

defendants.[1] This tactic was a way of persuading the jury that the defendant's story was a sham that could not convince any other black person.

Both counsel in the instant case engaged in the exchange of epithets. The public defender was rude on more than one occasion; it was he who first injected the question of race into the trial, in a way that was, at least, in poor taste. However, the response of the prosecutor went beyond answering the public defender's remarks. ■ A prosecutor's misconduct cannot be justified on the ground that defense counsel "started it" with similar improprieties. (*People* v. *Kirkes, supra,* 39 Cal.2d 719, 725-726; *People* v. *Sampsell* (1950) 34 Cal.2d 757, 765 [214 P.2d 813]; *People* v. *Kramer* (1897) 117 Cal. 647, 650 [49 P. 842]; *People* v. *Talle, supra,* 111 Cal.App.2d 650, 677.) The proper way for the prosecutor to correct misconduct by defense counsel is to object and have the trial judge reprimand the misbehavior and admonish the jury to disregard such remarks. (*People* v. *Kirkes, supra,* pp. 719, 725-726.) ■ By not reprimanding either counsel, the trial judge in the instant case allowed the trial to be conducted at an emotional pitch which is destructive to a fair trial. And by not sustaining the objections of defense counsel, the judge allowed the prosecutor to make an argument based on racial prejudice and the status of the public prosecutor's office—a serious threat to objective deliberation by jurors.

■ We are satisfied that the misconduct of the prosecutor objected to by defense counsel must be held to constitute prejudicial error in the circumstances of the instant case. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) In most sex offense cases the alleged perpetrator of the crime and the alleged victim are the sole or principal witnesses, and as in the instant case, there is a sharp conflict between their testimony. In these circumstances, there is grave danger that misconduct of counsel may tip the scales of justice. In the circumstances of the instant case, there is a reasonable probability that absent the prosecutor's misconduct objected to by the defense the jury might have reached a different result.

The combination of the two elements of such misconduct—the unsupported assertion that the defendant and his counsel fabricated the "pick-up" story and the statements of personal belief in defendant's guilt, built on a racial foundation—may well have swayed the jury in what was otherwise a close case. Similar misconduct has been held in other cases to

---

[1]Although defense counsel did not object a second time to the remarks by the prosecutor concerning why he signed the complaint and his racial "understanding" of a fellow black man, defendant cannot now be deemed to have waived objections to these items of alleged misconduct. Another objection, right after the trial judge overruled the previous one, would have been futile and would possibly have involved a risk of antagonizing the jurors. Defendant is not required to bear such a risk.

require reversal: the unsupported implication of a fabricated defense in *People* v. *Talle, supra,* 111 Cal.App.2d 650, 674-677; *People* v. *Nolan, supra,* 126 Cal.App. 623, 640; and *People* v. *Charlie, supra,* 34 Cal.App. 411, 414-415, and the statement of personal belief in defendant's guilt in *People* v. *Kirkes, supra,* 39 Cal.2d 719; *People* v. *Edgar, supra,* 34 Cal. App. 459, 468. In view of our conclusion that misconduct objected to constituted reversible error, it is not necessary to consider whether the misconduct which was not objected to would be prejudicial.

■ A different problem is presented by defendant's conviction of possession of a concealed "dirk or dagger." It is urged that as a matter of law the knife is not a "dirk or dagger" within the meaning of section 12020 of the Penal Code. ■ The statute, which provides for punishment of up to one year in the county jail or up to five years in prison, does not define the term "dirk or dagger."

As is the usual practice in interpreting criminal statutes, the term "dirk or dagger" is to be strictly construed. Moreover, concealed possession on the person of seemingly more lethal weapons, such as a pistol, revolver, or other firearm, without more, is a misdemeanor (Pen. Code, §§ 12025, 12031). In view of the possible greater punishment for concealed possession of a dirk or dagger, it would *not* seem reasonable to conclude that the Legislature used those terms broadly. It should also be pointed out that the other instruments mentioned in section 12020 are either items having no substantial innocent purpose, like a blackjack; an instrument ordinarily having an innocent purpose but constructed or altered for violent purposes, namely, a sawed-off shotgun; or a highly dangerous item, an explosive substance other than fixed ammunition.[2]

Further indication that the Legislature intended the terms "dirk" and "dagger" to be strictly construed is found in section 3024 of the Penal Code which increases the minimum punishment for certain felonies when the felon at the time of commission of the felony or at the time of arrest is armed with a deadly weapon or has such concealed on his person. The statute defines the term "deadly weapon" to include "any dirk, dagger . . . any knife having a blade longer than five inches, . . ." Thus, the Legislature did not include all knives within the terms "dirk" and "dagger." ■ This indicates, also, that there is substantial significance in the length of the blade being less than five inches.

In *People* v. *Ruiz,* 88 Cal.App. 502, 504 [263 P. 836], the court held

---

[2]Section 12020 prohibits possession (whether or not concealed), sale, etc., of all the enumerated items except the dirk, dagger and explosive substance. As to the latter items only possession that is concealed is prohibited.

that a bayonet which had been partly filed off was a dagger. The court stated: "A dagger has been defined as any straight knife to be worn on the person which is capable of inflicting death except what is commonly known as a 'pocket knife.' Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)"

In *People* v. *Shah,* 91 Cal.App.2d 716, 720 [205 P.2d 1081], the above language was quoted with approval, and the court held that a seven-inch spring-blade knife was a dagger because the blade locked in place. However, the Legislature excluded spring-blade knives from the felony section when in 1957 it adopted section 653k of the Penal Code making it a misdemeanor to carry a concealable switchblade knife, and by its definition of a switchblade knife included spring-blade knives. (Stats. 1957, ch. 355, p. 999.) (The section was amended in 1959 to delete the requirement that the knife be concealed. (Stats. 1959, ch. 355, p. 2278.))

We adopted the approach set forth in the above two cases when, in *People* v. *Forrest,* 67 Cal.2d 478 [62 Cal.Rptr. 766, 432 P.2d 374], we held that as a matter of law a folding knife with handguards, a blade six inches long, and a handle eight inches in length was not a dirk or dagger within the meaning of section 12020. We pointed out that dirks or daggers were originally used in dueling and required blades locked into place to be effective, that they were designed for stabbing, that the knife in that case folds like a pocket knife, that the blade did not lock in place, and that its failure to lock severely limits its effectiveness as a stabbing weapon because if the blade should hit a hard substance as a bone there is grave danger that the blade would close on the hand of the wielder. We concluded that "when a knife which, like other pocketknives, has many possible uses, some of which are clearly innocent and utilitarian, also has a characteristic which in many situations will substantially limit the effectiveness of its use as a stabbing instrument, it cannot be held to be a weapon primarily designed for stabbing, and thus is not a dagger or dirk." (67 Cal.2d at p. 481.)

We have concluded that it is a question of fact for the jury to determine whether the instant knife is a "dirk or dagger." Like the folding knife in *Forrest,* the knife in the instant case has handguards to prevent the hand slipping onto the blade if used as a stabbing weapon. Although the blade is shorter than that in *Forrest,* it is slightly longer than that of the ordinary boy scout knife. Unlike the knife in *Forrest,* the blade of the instant knife

locks in place, thus it does not have the characteristic found in *Forrest* "which in many situations will substantially limit the effectiveness of its use as a stabbing instrument, . . ." (67 Cal.2d at p. 481.) Accordingly, we reject the claim that the instant knife could not be found by the jury to be a "dirk or dagger."

On the other hand, the knife in the instant case cannot be held as a matter of law to be a "dirk or dagger." All three of the cases which have discussed the term "dirk or dagger," agree that the term does not include what is commonly known as a pocketknife. Like the ordinary pocketknife, the instant knife folds, and although it might be viewed by some as too large to qualify as a pocketknife, the knife is not so large that when folded it will not lie flat on the bottom of the pocket of men's pants. It is for the jury to determine whether the instant knife should be categorized as what is commonly known as a pocketknife.

■ Because a close question of fact is presented as to whether the instant knife is a "dirk or dagger," the misconduct of the prosecutor objected to by the defense must also be held prejudicial with respect to the conviction of violation of section 12020 of the Penal Code.

The judgment is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**MOSK, J.**—I concur.

However, I find it difficult to follow the opinion in its discussion of the dirk or dagger. Purporting to rely upon *People* v. *Forrest* (1967) 67 Cal. 2d 478 [62 Cal.Rptr. 766, 432 P.2d 374], the majority conclude that "it is a question of fact for the jury to determine whether the instant knife is a 'dirk or dagger.' " Yet in *Forrest* the court majority held the object involved was not a dirk or dagger *as a matter of law*. (*Id*. at p. 480.) In my dissent in that case I insisted the absence of a mathematically precise statutory definition of a dirk or dagger requires that the nature of the instrument be determined by the trier of fact. I noted that "the Legislature was unwilling or unable to predict developing refinements in the macabre art of weaponry. It sought, by the use of generic terms, to proscribe weapons 'common to the criminal's arsenal,' and left to the trier of fact to ascertain whether a seized object comes within the category of contraband." (*Id*. at p. 482.)

While it is of some comfort that the majority have finally agreed this problem is merely factual, they should aid trial courts by clearing up the confusion resulting from previous error and forthrightly overrule *Forrest*.

**BURKE, J.**—I concur with the majority to the extent that they reverse the convictions of defendant of forcible rape, false imprisonment and oral copulation, for the prosecutor committed misconduct which, in view of the conflicting testimony on these issues, may have been prejudicial to defendant. I dissent, however, from the reversal of defendant's conviction for possession of a concealed dirk or dagger, for there was no conflict whatever on this issue and the prosecutor's misconduct could not possibly have affected the jury's verdict.

The evidence is uncontradicted that at the time of his arrest defendant was carrying, concealed on his person, a knife 11 inches long whose blade was nearly 5 inches long. Although the blade's sides were dull and not useable for cutting, the knife was particularly appropriate for stabbing, since its tip was sharply pointed, its handguards prevented one's hand from slipping down the shaft, and the blade could easily be locked into place.

The majority correctly note that Penal Code section 12020 does not define "dirk or dagger." The cases, however, have noted that "A dagger has been defined as any straight knife to be worn on the person which is capable of inflicting death except what is commonly known as a 'pocket knife.' Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) *They may consist of any weapon fitted primarily for stabbing.*" (Italics added; *People* v. *Ruiz,* 88 Cal.App. 502, 504 [263 P. 836]; see *People* v. *Shah,* 91 Cal.App.2d 716, 720 [205 P.2d 1081] (holding a 7-inch spring-blade knife to be a dagger because the blade locked in place).) Thus, in *People* v. *Forrest,* 67 Cal.2d 478, 480-481 [62 Cal.Rptr. 766, 432 P.2d 374], we stated that dirks or daggers are knives which are designed for stabbing having blades either fixed in an open position or capable of locking into place. Accordingly, in *Forrest* we concluded that a folding knife whose blade did not lock into place was not a dirk or dagger since "it cannot be held to be a weapon primarily designed for stabbing . . . ." (67 Cal.2d at p. 481.)

As noted above, the knife found in defendant's possession was obviously designed for stabbing; its dull cutting edge rendered it useless for any other purpose. I would hold, therefore, that the knife was a dirk or dagger as a matter of law, for no reasonable juror could have concluded otherwise. But even if the majority were correct in holding the question to be a factual one, in the instant case the question *was* presented to the jury under appropriate instructions derived from the foregoing cases, and the jury resolved this assertedly factual question against defendant.

The majority suggest that the prosecutor's misconduct may have tainted the jury's determination of the "dirk or dagger" issue. But the misconduct pertained solely to the question of defendant's guilt on the rape and other

related counts, a question upon which sharply conflicting testimony existed. The prosecutor's asserted belief in defendant's guilt on those counts and the suggestion that defendant may have fabricated a defense to those counts could not have obscured the simple factual question whether, on uncontradicted facts, defendant possessed a dirk or dagger.

Since it is not reasonably probable that the jury would have acquitted defendant on the concealed weapon charge but for the prosecution misconduct (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), I respectfuly dissent from the reversal of the conviction rendered on that charge.

McComb, J., concurred.