Filed 10/14/15  P. v. Soul CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAMION HENRI SOUL,<br><br>    Defendant and Appellant. | G050349<br><br>(Super. Ct. No. 13CF2824)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge.  Affirmed in part, reversed in part.

Elizabeth Garfinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

A jury convicted defendant Damion Henri Soul of pimping (Pen. Code, § 266h, subd. (a); count 1; all further statutory references are to the Penal Code) and pandering (§ 266i, subd. (a); count 2).  The court found true sentence enhancement

allegations that defendant had suffered two prior strike convictions (§ 667, subds. (b)-(i)) and had served four prior prison terms (§ 667.5, subd. (b)).

The court sentenced defendant to a total prison term of ten years as follows: concurrent terms of eight years (midterm doubled for the strike priors) on each of counts 1 and 2; plus two consecutive one-year terms for the prison priors. The court stayed (§ 654) the sentence on count 2, pending completion of the term on count 1.

Defendant argues the court erroneously instructed the jury on pandering by not defining the word "'device'" as it is used in section 266i, subdivision (a)(2) and CALCRIM No. 1151. He also claims the evidence is insufficient to support the judgment, the prosecutor engaged in multiple instances of misconduct, and his attorney provided ineffective assistance of counsel.

We conclude the evidence is insufficient to support the pandering conviction. This conclusion moots defendant's jury instruction claim, and his prosecutorial misconduct and ineffective assistance claims insofar as they relate to the pandering conviction. We also conclude defendant's other prosecutorial misconduct and ineffective assistance claims lack merit, and affirm the judgment in all other respects.

## FACTS

*1. Prosecution's Case*

    *a. Background*

Around 5:30 a.m. one morning in early September 2013, two Santa Ana Police Detectives, Luis Barragan and Jorge Arroyo, were engaged in an undercover prostitution suppression operation on Harbor Boulevard between MacArthur Boulevard and 17th Street in Santa Ana, an area notorious for prostitution that is sometimes referred to as "the track." Barragan observed a woman known as Versey walking on Harbor Boulevard. Barragan described her as "walking the track in literally underwear." Barragan watched Versey approach a car that had pulled to the curb. She and the driver

2

engaged in a brief conversation through the passenger window before Versey got into the car. The car drove away, but it returned about 10 minutes later.

Versey got out of the car and went back to the curb. Within minutes, another car stopped. As before, Versey approached from the passenger side, had a quick conversation with the driver, and then got into the car. Again, she returned about 10 minutes later. However, this time when Versey got out of the car, she used a cell phone and quickly walked around the corner to a parked car. As she neared the car, Versey reached into her bra and pulled out what appeared to be money. She handed the money to the driver, who was defendant, and then got into the passenger seat.

Barragan and Arroyo detained defendant and Versey. Barragan found $70 in cash on the car seat, and a disposable phone and approximately $1,600 cash on defendant's person. Barragan also saw a tattoo on defendant's right hand. It was the letter "P" with a crown over it. As she was getting out of defendant's car, Versey dropped a disposable phone. Using the phone Versey dropped, Arroyo sent a text message to her contact, "Charming," which was received by defendant's disposable phone.

Phone records showed multiple text messages between Versey and unidentified individuals that were consistent with price negotiations for sex acts. Beginning the day before their arrest, there were also numerous calls and texts between defendant and Versey. Versey referred to defendant as "daddy," and defendant told her she was a "gud girl" and a "gud bitch." He texted "where are you at[,]" and asked if Versey was "on a date." Defendant also texted, "Are you good?" Versey responded, "Yeah, I'm good daddy. . . . Thanks for checking up on me." There was one threatening text that read, "Yea, bitch, you done fucked up. You at the top of my list. I'm making it my business to find you today and bust your shit open. Period." But that text did not come from the phone in defendant's possession.

In defendant's car, police officers found a DVD entitled, "America's Daughters, the Reality of American Prostitution," a piece of paper with the words, "get daddy's clothes," a piece of paper referencing a prostitution Web site (myredbook.com), a piece of paper entitled "daddy's court dates," which referred to defendant's outstanding traffic violation, and a handwritten list of questions pimps commonly give prostitutes to ask potential clients before engaging in prostitution.

### b. Expert Testimony

Barragan testified as the prosecution's prostitution, pimping, and pandering expert. Barragan's training included identification of prostitution-related activities and common signs, symbols, and terms used by pimps and prostitutes. He also received training about the nature of the pimp/prostitute relationship, including some of the rules pimps enforce to control prostitutes. In the over four years he had been with vice, Barragan had come into contact with "thousands" of prostitutes and "[a] couple hundred" pimps, and he had participated in well over 200 prostitution suppression programs.

According to Barragan, a pimp controls as many as seven prostitutes at any one time. He takes all of the money the prostitute earns by performing sex acts and provides her with essentials like food and clothing. Recruiting styles among pimps vary. Some pimps use Web sites like myredbook.com, which is an online escort site, or blogs like backpage.com, while other pimps use a more personal approach. A "Romeo pimp" uses kindness to control his prostitutes while a "guerilla pimp" uses fear and intimidation, but most pimps use a combination of fear and kindness to gain a prostitute's compliance. A pimp tells his prostitutes how much to charge for specific sex acts, how to check in and contact and communicate with him, and how to evade law enforcement. Typically, pimps and prostitutes remain in contact with each other through disposable cell phones.

Barragan said prostitutes commonly refer to their pimps as "daddy." They do not refer to anyone else by that cognomen because doing so leads to a verbal or physical reprimand. The pimp controls the prostitute's schedule and behavior, and she

4

must ask permission to do things. Although not always visible, Barragan testified a pimp is never far from his prostitute.

Barragan also testified that a pimp and prostitutes arrange to meet each other after one, two, or three dates so the prostitute can turn over the money. The prostitute will text or call her pimp and let him know what she is doing and how much money she made. For street-level prostitution, Barragan testified, "Typically the female will direct [the client] to a specific location whether she has a hotel room, whether she has [a] secluded spot, or a location where she has been told that she has to go to if she has a date." With a so-called "car date," the sex act is performed in a car. The average price for a 10-minute car date is $30 to $50. Prostitutes are loyal to one pimp, but they may have many pimps over time.

In Barragan's opinion, when Versey was "on a date," she was engaging in prostitution. Referring to defendant's text's, Barragan testified pimps refer to their prostitutes as bitches, and the texts between defendant and Versey were consistent with a pimp/prostitute relationship. According to Barragan, defendant's hand tattoo is also consistent with pimping. Pimps use the letter "P" as a symbol of their profession, and the crown represents being a kingpin. Furthermore, Barragan testified the money, the DVD's, and the papers found in defendant's car were also consistent with prostitution.

2. *Section 1181.1 Motion for Judgment of Acquittal*

At the conclusion of the prosecution's case, defendant moved for acquittal under section 1118.1. For count 1, pimping, defense counsel argued the prosecution failed to prove his client knowingly received money from prostitution. For count 2, pandering, defense counsel asserted there was no "evidence to suggest that [defendant] encouraged the prostitution or supported the prostitution."

The prosecutor asserted evidence defendant stayed in the area where Versey worked, coupled with the expert's testimony, was sufficient to demonstrate defendant provided security for Versey's prostitution. The prosecutor continued, "In

5

terms of encouraging there is literally a text where the prostitut[e], in this case Ms. Versey, sends him a text talking about the dates and literally – when she says to him, 'I'm on a date,' he literally says to her 'good girl' which is frankly encouragement. And then his additional help of, again, encouraging her, keeping an eye on her, checking in on her is all towards pandering."

After further discussion between the court and counsel, the prosecutor continued, "We know the defendant is actually . . . present when she is committing her act of prostitution. We know the pimp's role in the prostitution activity. Additionally, we also know that at around 6:00 when the – after the two car dates when Ms. Versey was walking away from the two car dates, she made a phone call to the defendant. We know – this is not through testimony but through the exhibits. The exhibits specifically have her making two phone calls at 6:02 and 6:03 in the morning to the defendant. She goes right over to his car and then hands him the money."

The court responded, "That shows pimping." The prosecutor clarified, "the[] text messages and the expert testimony clearly establish a relationship between this defendant and . . . Versey. If he's encouraging her to be a prostitute and she is committing those acts of prosecution in this county," it is a continuing course of conduct that constitutes pandering.

Later that afternoon, the prosecutor again clarified, "[i]t is the People's contention . . . the defendant persuaded, procured and it is our argument that [he] encouraged as well . . . acts of prostitution and he did it with the intent to influence her to be a prostitute or to basically continue as a prostitute."

The court found sufficient evidence to support the pimping charge. However, for pandering, the court indicated confusion over "the People's theory . . . as to count 2." The prosecutor responded, "My theory on this simply would be that if you simply look at the jury instructions for pandering, it talks about how the defendant must

6

encourage or promote or procure someone in prostitution with the intent of them to continue those acts of prostitution."

The prosecutor theorized Versey may have exchanged money for defendant's protection, among other things, and he argued, "when you look at everything in its entirety, the fact that . . . Barragan testified that a pimp basically controls their life, the pimp tells them what to do, the pimp comes up with those type of questions, those documents are in the defendant's . . . car. That coupled with the 'good girl,' coupled with the red book ad being created on September 3rd, the fact that she doesn't act without his permission, the fact that she asked if they can go somewhere else. He's controlling her. All of those things factor into him pandering this girl."

The court ultimately denied defendant's section 1118.1 motion as to both counts.

*3. Defendant's Case*

Defendant, a convicted felon, testified on his own behalf. He denied being a pimp or panderer. He said the "P" tattoo on his hand was for Pomona and his former rap group, the Pomona Kings. He said he met Versey at a strip club in Pomona about three months before his arrest. Defendant testified they spent time together, went on a couple of dates, and talked continuously. He denied having sexual intercourse with her.

Defendant explained the most incriminating texts between him and Versey were simply evidence of his attempts to help Versey distance herself from an abusive boyfriend. When he referred to Versey as a good girl, he was consoling her. Defendant said he used the word "bitch" frequently because it is common urban street slang for women. He also said he knew Versey was an escort, but he denied knowing she was a prostitute.

Defendant testified that he liked Versey and wanted to be her boyfriend. He explained his nickname, Charming, by saying others had noticed that he was "a nice person, generous, polite towards the ladies . . . ." As for Versey calling him daddy,

defendant testified "I guess she calls everyone daddy." Defendant admitted giving Versey a to-do list for his traffic tickets, and another one in preparation for a trip, but he denied any type of ongoing pimp/prostitute relationship. Defendant testified he earned the $1,600 found in his car doing odd jobs, and that he carried the money in cash because he did not have a bank account. Defendant admitted ownership of the DVD found in his car, but he denied owning other items.

## DISCUSSION

*1. Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence to prove both pimping and pandering. When addressing such claims, the reviewing court evaluates the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Story* (2009) 45 Cal.4th 1282, 1296; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

The substantial evidence standard also applies when the prosecution relies primarily on circumstantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) On review, we accept any logical inferences the jury could have drawn from the circumstantial evidence because the jury, not the reviewing court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*Ibid.*)

*a. Pimping*

Section 266h, subdivision (a) states "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . is guilty of . . . a felony." The complaint and the information both alleged defendant violated section 266h by knowingly deriving support and maintenance, in whole or in part, from Versey's prostitution.

8

The trial court instructed, pursuant to CALCRIM No. 1150, that a conviction for pimping required the People to prove "the defendant knew that Ms. Versey was a prostitute," and "that money and proceeds that Ms. Versey earned as a prostitute supported the defendant in whole or in part." It is a general intent crime. (*People v. McNulty* (1988) 202 Cal.App.3d 624, 630-631 [Deriving support "with knowledge that the other person is a prostitute is the only requirement [for] violating [the] section." No specific intent is required].)

The jury found defendant knowingly received support from a prostitute. Defendant does not vigorously challenge this finding. According to the evidence and Barragan's expert testimony, Versey engaged in acts of prostitution and defendant knowingly took the proceeds. Therefore, substantial evidence supports the jury verdict on pimping.

### b. Pandering

Section 266i, subdivision (a) sets out six alternative methods of pandering.[1] The complaint charged a specific violation of section 266i, subdivision (a)(6), and alleged defendant pandered when he "did unlawfully receive and give, and agree to receive and

---

[1] Section 266i, subdivision (a) states, "Except as provided in subdivision (b), any person who does any of the following is guilty of pandering . . . . [¶] (1) Procures another person for the purpose of prostitution. [¶] (2) By promises, threats, violence, or by any *device* or scheme, causes, induces, persuades, or encourages another person to become a prostitute. [¶] (3) Procures for another person a place as an inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state. [¶] (4) By promises, threats, violence, or by any *device* or scheme, causes, induces, persuades, or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate. [¶] (5) By fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution. [¶] (6) Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution." (Italics added.)

give, money and thing of value for procuring and attempting to procure JANE DOE for the purpose of prostitution." However, the information charged a general violation of section 266i, subdivision (a), with no subsection specified, and alleged defendant "did unlawfully cause, induce, persuade and encourage JANE DOE to become a prostitute, and did procure JANE DOE for the purpose of prostitution."

The pandering jury instruction given describes a violation of section 266i, subdivision (a)(2). It told the jury, "The defendant is charged in count 2 with pandering in violation of . . . section 266[i]. To prove the defendant is guilty of pandering, the People must prove that, one, *the defendant used promises threats, violence, or any device or scheme to cause, persuade, or encourage* Ms. Versey to become a prostitute; two, the defendant intended to influence Ms. Versey to be a prostitute. It does not matter whether Ms. Versey was a prostitute already." (Italics added.)

Defendant asserts the prosecution failed to prove he caused, persuaded or encouraged Versey to engage in prostitution by means of promises, threats, violence, or by any device or scheme, as required by section 266i, subdivision (a)(2). We agree. While there is ample evidence of prostitution and pimping, there is insufficient evidence of pandering in violation of section 266i, subdivision (a)(2), which was the only theory presented to the jury. Therefore, the conviction on count 2 must be reversed.

The Attorney General argues for a contrary result, relying on *People v. Zambia* (2011) 51 Cal.4th 965 (*Zambia*). In *Zambia*, the defendant was also convicted of pandering under section 266i, subdivision (a)(2). On appeal, he argued section 266i, subdivision (a)(2) excluded current prostitutes by making it a crime to "'[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person *to become a prostitute*.'" (*Zambia*, at pp. 971-972, italics added.)

The California Supreme Court disagreed, stating, "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the

10

target:  that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement.  To encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status. . . .  The phrase 'encourages another person to become a prostitute' can readily be understood to encompass the goal that the target 'become a prostitute' in the future for the benefit of the encourager or some other pimp.  [Citation.]"  (*Zambia, supra,* 51 Cal.4th at p. 975.)

Focusing on the *Zambia* court's references to inducement or encouragement, the Attorney General argues evidence defendant and Versey had a pimp/prostitute relationship, i.e., their frequent communication via cell phone and their involvement in prostitution in an area known for prostitution, is sufficient to support a conviction under section 266i, subdivision (a)(2).  The Attorney General concludes evidence defendant used "promises, threats, violence, or by any device or scheme" is not necessary to support the pandering conviction, or that the way defendant encouraged Versey could constitute a device or scheme.  We disagree.

First, contrary to the Attorney General's line of reasoning, *Zambia* does not hold that promises, threats, violence, or by any device or scheme are unnecessary for a conviction under section 266i, subdivision (a)(2).  And, in any event, there was evidence of promises, threats, violence, or device or scheme in *Zambia*.  The defendant talked to an undercover police officer working as a prostitute and told her he would be her new pimp.  When asked what that meant, the defendant said he would "'take care of [her],'" and provide food, clothing, and security.  (*Zambia*, *supra*, 51 Cal.4th at p. 970.)  The officer testified the defendant "used an aggressive tone of voice and demeanor," and she "characterized him as acting like a 'gorilla pimp,' or one who uses 'verbal threats and violence to get their way and to scare prostitutes into working for them.'"  (*Id.* at p. 971.)

Furthermore, the Attorney General's interpretation of section 266i, subdivision (a)(2) would make surplusage the phrase,"[b]y promises, threats, violence, or

11

by any device or scheme." If encouragement is all that is needed, what is the difference between section 266i, subdivision (a)(1) and section 266i, subdivision (a)(2)? We must avoid "interpretations that render statutory terms meaningless or surplusage." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010.)

Finally, the Attorney General is vague about what evidence ostensibly proves the encouragement. The Attorney General relies on the fact of a pimp/prostitute relationship, coupled with the expert's general testimony, and then asserts, "[Defendant] believes that this evidence does not constitute substantial evidence that [defendant], through some scheme of his own, was encouraging Versey to engage in prostitution." However, none of the facts mentioned provide direct or circumstantial evidence defendant used a device or scheme to encourage Versey to engage in prostitution, and there is no evidence of any promises, threats, or violence.

In sum, we have no quarrel with *Zambia*. It simply does not support the Attorney General's arguments on the sufficiency of the pandering evidence.

## 2. *Prosecutorial Misconduct*

### a. *Governing Principles*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

"A claim of prosecutorial misconduct is generally reviewable on appeal only if the defense makes a timely objection at trial and asks the trial court to admonish the jury to disregard the prosecutor's question. [Citations.] "'[O]therwise, the point is

12

reviewable only if an admonition would not have cured the harm.'"'" (*People v. Sapp* (2003) 31 Cal.4th 240, 279.) With one exception, defense counsel did not make the necessary objections, nor request any admonitions. Nevertheless, we find no merit in any of defendant's asserted instances of prosecutorial misconduct.

### b. Misstatements of Law

Defendant first asserts the prosecution misstated the law on both offenses. His assertions as to pandering are now moot. With respect to pimping, defendant claims the prosecutor minimized the burden of proof by saying, "I am not asking you – well, I think through the expert testimony you could convict him just based on say the 'daddy' reference multiple times from multiple women. You could convict him on that alone. I'm not asking you do to that. That's not all I have here. I have a lot more. [¶] Defense counsel or defendant talked to you about that tattoo and says, oh, I was in a rap group and we were the crowns – the Pomona Crowns or Kings or something. Maybe that . . . sounds okay, but you got to look at everything. The tattoo, the timing, the location – the location where he was at with the girl, the type of conduct she is doing, what's in his car, what's he called. You have to look at it in its entirety."

Defendant also challenges the following remark: "If you think he is not a pimp, then he is just not guilty. If you think he wasn't involved in some pimping activity or that he wasn't trying to encourage her in prostitution, he's not guilty of both crimes. Just find him not guilty. [¶] But if you think he was encouraging her in any way, whether he received money or not, or you think he was getting money he's guilty." The jury was free to reject defendant's testimony, and there is ample circumstantial evidence defendant knew Versey was a prostitute, and that he knowingly made money from her prostitution.

However, prosecutors are given wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions from it. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) The prosecutor's arguments here were based on evidence and testimony. They did not

13

misstate the law, encourage jurors to base their verdicts on passion or emotion, or demean the defense. And, consequently, we find no merit to this prosecutorial misconduct claim.

### c. Violation of Court Order

Defendant next claims the prosecutor knowingly violated a court order to exclude evidence of his dollar sign tattoo. We disagree.

On the second day of trial, the prosecutor told the court he had seen tattoos on defendant's hands, and he wanted Barragan to see the tattoos and give an expert opinion whether the tattoos were related to pimping. Defense counsel objected on grounds of surprise because his client's hand tattoos had not been material evidence before.

During an Evidence Code section 402 hearing, Barragan, an undisputed expert in human trafficking, pimping, and pandering, testified he had noticed the tattoos on defendant's hands at some point. Barragan said defendant had a dollar sign with the words, "Fuck You, Pay Me" written over the top on his left hand. According to Barragan, getting money, thus the dollar sign or dollar bills, is commonly associated with pimp culture. On defendant's right hand, there is the letter "P" with a crown on it. Barragan testified pimps use the letter "P" in writings, pictures, and texts messages. The crown over the letter "P" means this pimp is king. However, Barragan also conceded the letter "P" is associated with various other groups.

The court ruled admissible evidence of the tattoo on defendant's right hand (the crowned letter "P"), but excluded evidence of the tattoo of the dollar sign and colorful language on defendant's left hand as more prejudicial than probative. (Evid. Code, § 352.)

During redirect, the following colloquy occurred between the prosecutor and Barragan: "[The prosecutor]. And for instance do pimps often use dollar signs? [¶] [Barragan.] Yes, sir. [¶] Q. And that often indicates pimping culture? [¶] A. Yes. [¶]

14

Q.  In relation to the crown, have you been trained as to the crown being one of the key symbols of the pimping culture?  [¶] A.  Yes, sir."

Defendant argues the prosecutor knowingly violated the court's order to exclude evidence of the tattoo on defendant's right hand, which the jury could see throughout the trial.  But the record reveals a misstatement by the prosecutor.  Read in context, the prosecutor's questioning was clearly about defendant's "P" tattoo.  The fact the prosecutor mistakenly uttered the word dollar sign in the process does not constitute prosecutorial misconduct.

### d. Intemperate Behavior

Defendant next claims the prosecution mocked the deliberative process and engaged in a pattern of rude and intemperate behavior during rebuttal by arguing, "You want to explain away the tattoos, knock yourself out.  You want to explain away why one of the girls calls him daddy, knock yourself out.  But you can't explain away all of those little facts."  And, later arguing, "You may say he seems like a nice enough guy, the prosecution's victimless crime.  Knock yourself out."  And, still later, stating, "If you believe the defendant as he testified and say, gosh I don't know, he would not be guilty.  But if you find that unreasonable in light of all of the evidence that we submitted to you, you must find him not guilty."  We find no misconduct.

Again prosecutors are given wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions.  (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.)  When the prosecutor's arguments are based on inferences reasonably drawn from the evidence, there is no misconduct.  (*People v. Ward* (2005) 36 Cal.4th 186, 215 [prosecutor's argument may be vigorous provided it amounts to fair comment on evidence].)

Here, the prosecutor's arguments were based on evidence and testimony.  Defendant chose to testify and thereby subject his credibility to the prosecutor's fair comment.  Moreover, "when the claim focuses upon comments made by the prosecutor

15

before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) We find no such likelihood here.

### e. Improper Personal Opinions

Defendant also asserts the prosecution improperly gave personal opinions about guilt by first characterizing defendant's version of the facts as unreasonable, and then telling the jury "[f]or you to find this defendant not guilty, it would be as if he were the unluckiest person on the planet." And, later arguing, "Folks, I would submit to you if there was ever an easy verdict on a pimping or pandering case, this is it. And the reason I say that is because you are not – you're never going to get evidence better than [that]."

The court sustained defense counsel's objection to the final statement. However, citing *People v. Bain* (1971) 5 Cal.3d 839 (*Bain*), defendant claims the court's ruling did not cure the harm. We disagree.

In *Bain*, the prosecutor "first remarked that he personally believed the defendant not to be innocent. . . . Although his next comment was properly phrased, referring to his belief that the 'evidence' showed defendant's guilt, the thrust of the following argument to the jury was that he would not be prosecuting the case unless he personally believed the defendant to be guilty. He stated that he would not have 'signed the complaint' had he not been convinced that the defendant was not innocent of the crime. Since the complaint was signed *before trial*, the statement was bound to impress the jury in the precise way forbidden by *Kirkes*. [Citations.]" (*Bain*, *supra*, 5 Cal.3d at p. 848.)

Here, the prosecutor properly argued his theory of the case based on evidence produced at trial, not based on any personal belief. Prosecutors are permitted to vigorously argue their case. Nothing in the prosecutor's argument here equates to the improper personal opinion on guilt involved in *Bain*.

16

*f. Cumulative Error*

Defendant also claims the prosecutor's comments violated state and federal Constitutional rights to due process, and was prejudicial considered individually or collectively because the evidence was insufficient to prove the charges. We have rejected each individual claim, and there was no cumulative prejudice.

*3. Ineffective Assistance of Counsel*

Defendant asserts trial counsel's performance fell below the standard expected of reasonably competent counsel, which deprived him of his constitutional rights to a fair trial, effective assistance of counsel, and fundamental fairness.

"To prevail on a claim of ineffective assistance of counsel, defendant 'must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.] Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]' [Citations.]" (*People v. Hart* (1999) 20 Cal.4th 546, 623-24.)

Defendant first complains: his attorney should have demurred to the complaint and information because neither alleged sufficient facts to sustain the pandering charge; counsel failed to request amplification of the word device as used in the pandering instruction; and counsel should have pursued the prosecution's failure to identify which subdivision of section 266i to prosecute, and the prosecution's failure to present evidence he threatened or forced Versey. Defendant also complains his counsel

17

failed to object to the court's instruction on section 266i, subdivision (a)(2) on grounds it included facts not presented at the preliminary hearing. All of these complaints are moot in light of our disposition of the pandering conviction.

Defendant next complains his counsel failed to object to the alleged instances of prosecutorial misconduct. We have considered each claim of prosecutorial misconduct and found none. Counsel is not required to make pointless objections. (*People v. Jones* (1979) 96 Cal.App.3d 820, 827.) Furthermore, "'[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel' [citation]." (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

*4. Cumulative Error*

Finally, defendant argues the cumulative effect of the errors undermines confidence in the outcome of the trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) However, having found no error, it is axiomatic we find no cumulative error.

## DISPOSITION

The judgment on count 2 is reversed, and the abstract of judgment shall be revised according. The clerk of the superior court shall convey a copy of the revised abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.


THOMPSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

19